Paul **KORDENBROCK**,
Plaintiff–Appellant,

v.

Gene **SCROGGY**, Warden, Kentucky State Penitentiary, et al.,
Defendants–Appellees.

Nos. 88–5467, 89–5107.

United States Court of Appeals,
Sixth Circuit.

Argued En Banc June 13, 1990.

Decided Nov. 21, 1990.

Rehearing and Rehearing En Banc Denied Jan. 30, 1991.

---

Edward C. Monahan (argued), Timothy T. Riddell (argued), Dept. of Public Advocacy, Frankfort, Ky., for plaintiff-appellant.

Frederic J. Cowan, Atty. Gen., Michael L. Harned, Asst. Atty. Gen., Carol C. Ullerich (argued), Cicely Lambert, [NTC ret] Administrative Office of Courts, Frankfort, Ky., for defendants-appellees.

Before MERRITT, Chief Judge, KEITH, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, MILBURN, GUY, NELSON, RYAN, BOGGS, and NORRIS, Circuit Judges.

MERRITT, Chief Judge, announced the judgment of the Court in part VIII granting the Writ of Habeas Corpus as to both criminal liability and sentence, a judgment in which seven of the thirteen members of the *en banc* Court concur (Circuit Judges MERRITT, KEITH, BOYCE F. MARTIN, Jr., NATHANIEL R. JONES, MILBURN, DAVID A. NELSON, and RYAN), and in which one member concurs as to the sentence (Circuit Judge ALAN E. NORRIS).

As in many death penalty, habeas corpus cases, the problem presented here is not whether the prisoner is innocent of a homicide—the killing is conceded—but rather

whether he received the full benefit of fair rules of constitutional procedure and a fair opportunity to offer to the jury mitigating circumstances that might dissuade them from imposing a sentence of death.

It is not the Court's duty to determine whether Kordenbrock deserves or does not deserve the death sentence for his crime. The Court's duty is to insist upon the observance of constitutional norms of procedure. The District Court, and the panel decision of our Court which has now been vacated by the grant of *en banc* review (*see* 6th Cir.R. 14), held that petitioner was not entitled to habeas relief. Because a majority of the *en banc* Court finds that the introduction and use of Kordenbrock's confession was in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was not harmless error, we now reverse.

## I. Facts

Petitioner Kordenbrock and co-defendant Michael Kruse agreed to steal guns from an auto parts store in Florence, Kentucky. For two days before the robbery, they visited the store to observe the layout. The night before the robbery they stayed with a friend in Cincinnati where they drank alcohol, smoked marijuana, and snorted cocaine. The next morning at 8:00 Kordenbrock drank two beers and took two Quaaludes.

After leaving the apartment, the two stopped to buy more Quaaludes. From there they proceeded to the auto parts store and arrived around 9:30 a.m. Kordenbrock, who was holding a gun, ordered the owner of the store, Mr. Thompson, and an employee, Mr. Allen, to lie face down on the floor in the back of the store. Just then a customer came in with his son. Kruse pretended he was an employee and told the customer the store did not have what he wanted.

Kruse then broke the glass gun case. Immediately following that Mr. Allen either moved or attempted to get up. Peti-

tioner shot both men. Mr. Allen later died, but Mr. Thompson survived. When Kruse had assembled the guns the two left the store.

They stopped at two different places to sell some of the guns. One of the men to whom they sold the guns recognized Kordenbrock's picture which appeared on the local news and cooperated with police in bringing about his arrest. Upon his arrival at the police station a group of police began to question him after giving him *Miranda* warnings. The interrogation began around 11:30 p.m. Joint App. at 1057; *see also id.* at 71–110.

### A. The *Miranda* Warnings Violation

From the beginning of the interrogation, Kordenbrock was reluctant to talk with police, repeating the phrase, "I don't know what to say." *Id.* at 72, 75, 80. The officers, who already suspected that Kordenbrock had shot the two men, encouraged him repeatedly to relate details of the crime, saying, "you've got a conscience Paul." *Id.* at 73, 82, 83. After further coaxing petitioner admitted some aspects of the crime such as what type of car he drove the day of the shooting and where he had disposed of the gun.

In an effort to persuade Kordenbrock to give them more details of the actual shooting, the officers threatened him, saying that if he would not cooperate they were going to "book that girl [1] . . . . for accessory to murder . . . and put her in jail." *Id.* at 86. The officers continued: "Anybody that you have been with since yesterday morning, we can go out and arrest." *Id.* at 87. Still he resisted questioning, and indicated he wanted the questioning to stop: "I can't say nothing," *id.* at 91, "[c]an't talk, right now I can't talk." *Id.* at 92. Instead of ceasing questioning, the officers continued with their threats: "Their ass is going to jail. . . . [I]n Ohio, they can keep them in jail for about three days without even charging them. . . . they're going to be put through an ordeal they may not forget for

---

**1.** Abigail Smith, with whom Kordenbrock had stayed the night before the shooting, was with

Kordenbrock when he was arrested.

a long time Paul and you can stop it, right now...." *Id.* at 93.

After these threats, Kordenbrock stated: "I did it.... [t]hat's all I can tell you is that I did it." *Id.* at 94. He then asked to call the girls to see if they were all right and wanted "to know that those girls aren't going to be arrested" before he gave any more details. *Id.* However, when pressed further Kordenbrock made another attempt to cut off questioning: "I told you all I can stand tonight.... Sir, I can't talk about it no more tonight." *Id.* at 98. When the officers told petitioner they were going to write out his confession as he dictated it, he again responded: "Sir, I can't tell you no more tonight." *Id.* at 100. The officers, growing impatient, gave him "one more chance," *id.*, and he finally gave in: "I'll tell you what you need to know, I don't want you to go bother them girls...." *Id.* at 101.

Only then did Kordenbrock make the damning statements that undermined his defense of diminished capacity. The officer who was transcribing the statement said, "Paul, what I'm going to write here is—I, Paul Kordenbrock pulled the trigger aiming and firing the weapon into the two men's heads—is that correct?" *Id.* at 105. That statement was included in the signed confession. The confession did not include the statements made during the interrogation that his "eyes were half closed," and that he didn't aim at any particular spot. Apparently, in order to get the ordeal over with, he told the officers to "[p]ut [the fact that he aimed at their heads] in there." *Id.* The confession edited out facts that might support a defense of lack of premeditation and diminished capacity and simply read, "I then, Paul Kordenbrock, pulled the trigger,

aiming and firing at their heads so they wouldn't get up." *Id.* at 112.

## B. The State's Refusal to Provide a Psychiatric Expert for the Defense

Kordenbrock pled guilty to first degree robbery and was then tried for capital murder and attempted murder. His defense was diminished capacity due to drugs and alcohol and emotional disturbance.[2] His lawyers, employed by the Office for Public Advocacy of the State of Kentucky, sought to enlist the aid of a psychiatrist to help prove these and other mitigating factors. At the request of the trial judge, one of Kordenbrock's lawyers wrote to the Secretary of the Department of Human Resources to ascertain whether a state psychiatrist could perform this service. Joint App. at 161. The Secretary responded by letter that Department psychiatrists could only evaluate criminal defendants for their competency to stand trial and for the existence of mental disease or defect at the time the crime took place. The letter stated: "These evaluations are provided pursuant to court order and are supplied as a service to the court, and not to either the prosecution or the defense." *Id.* at 162. The Secretary characterized these evaluations as "objective" and "determined that this Department will not be able to assist you with your request." *Id.*

This letter made it clear that a state psychiatrist could not be used as a defense expert. The trial judge then entered an order stating that defense counsel could employ at state expense a psychiatrist, psychologist and a psycho-pharmacologist. *Id.* at 59. When the chief executive officer of the county in which the trial was to be held received the order, he refused to authorize

---

2. Two of Kentucky's statutory mitigating circumstances are as follows:

> The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime....

Ky.Rev.Stat.Ann. § 532.025(2)(b)(2) (Baldwin Supp.1989).

> At the time of the capital offense, the capacity of the defendant to appreciate the criminality

of his conduct to the requirements of law was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law is insufficient to constitute a defense to the crime....

Ky.Rev.Stat.Ann. § 532.025(2)(b)(7) (Baldwin Supp.1989).

payment: "The Boone County Fiscal Court will resist by all appropriate means the payment of any bill relative to the KORDENBROCK.... murder trial[ ]." *Id.* at 170. Apparently the county took the position that the state should pay for a defense expert, but the state had already refused, and continued to refuse, to pay for a psychiatric expert for the defendant.

Despite the fact that responsibility for payment was in dispute, defense counsel hired Dr. Nizny as a defense expert. Dr. Nizny examined Kordenbrock and made a report on his diagnosis and assessment of petitioner. However, Dr. Nizny, who was aware of problems other psychiatrists had encountered getting paid, refused to file his report until he received some sort of assurance that payment would be forthcoming. Once again the trial judge ordered the county to pay Dr. Nizny's fees. When the county continued to refuse payment, the trial court, over defense counsel's objection, ordered that petitioner be examined by a state psychiatrist. In response, the Director of Forensic Psychiatry Services wrote that "we will not be able to assist only the defense in this case. I will inform Judge Neace of our services to both the defense and the prosecution." *Id.* at 165. Despite this letter, the trial judge again ordered that a state psychiatrist examine petitioner.

Dr. Bland, a state psychiatrist, met with Kordenbrock, but could not form an accurate opinion because Kordenbrock's lawyers had told him not to cooperate with Dr. Bland. One of Kordenbrock's lawyers stated that his reason for instructing petitioner in that manner was that he met with Dr. Bland and the doctor "indicated that he could not examine Paul as our defense psychiatrist because of the Secretary's directive." Joint App. at 166.

In the meantime defense counsel had located a forensic psychiatrist who was willing to examine Kordenbrock without an unqualified guarantee to payment. Defense counsel filed a motion for a continuance for the new doctor to have time to prepare a report. However, due to a misunderstanding between the doctor and counsel, the doctor withdrew from the case. Apparently defense counsel, now without a suitable expert, asked the trial judge for a continuance to locate another expert, or alternatively another order on the issue of payment for Dr. Nizny. The judge refused the continuance and refused to enter an order for payment until Dr. Nizny filed his report. The trial proceeded without a defense expert.

Kordenbrock was found guilty of murder and attempted murder. The jury recommended that he be sentenced to death. He appealed to the Kentucky Supreme Court asserting 29 possible errors, none of which the court found to have merit. *Kordenbrock v. Commonwealth*, 700 S.W.2d 384 (Ky.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986).

He next sought habeas relief before the District Court in Kentucky. The District Court held an evidentiary hearing both on the voluntariness of Kordenbrock's confession and on the issue of his entitlement to a psychiatrist. Although the District Court found that the confession was taken in violation of his *Miranda* rights, the Court held that the introduction of the confession was harmless error. The District Court denied relief on all of the 23 grounds alleged. *Kordenbrock v. Scroggy*, 680 F.Supp. 867 (E.D.Ky.1988). A panel of this Court affirmed the District Court's findings. *Kordenbrock v. Scroggy*, 889 F.2d 69 (6th Cir.1989). The suggestion for rehearing *en banc* was granted. *Kordenbrock v. Scroggy*, 896 F.2d 1457 (6th Cir. 1990).

## II. *Use of Confession at Sentencing*

During the interrogation Kordenbrock repeatedly stated: "I can't tell you no more tonight." Despite this attempt to stop questioning, the interrogation continued. When asked by the District Court Judge whether he interpreted that statement to mean that the accused wanted questioning to cease, Detective Stamper responded disingenuously, "No, I never drew that kind of conclusion whatsoever from the conversation we were having...." Joint App. at 1068. Both the District Court

and a panel of this Court found that the confession was taken in violation of *Miranda*. *Kordenbrock*, 889 F.2d at 78. The state appears to concede this point based on *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), in which the Supreme Court stated that the "right to cut off questioning" must be "scrupulously honored," and that after an accused has invoked his right to silence the police may not "persist[ ] in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 104–06, 96 S.Ct. at 326–28. Both the Court below and the panel of this Court, however, found admission of the confession to be harmless error. *Kordenbrock*, 889 F.2d at 80.

Although it is true that "[t]he basic admission of guilt [of the killing] was ... not obtained in violation of *Miranda*," *id.* at 78, Kordenbrock made, and the confession recites, extremely prejudicial and incriminating statements made after the interrogation should have ceased. There is no argument that the entire interrogation is inadmissible. He concedes that he committed the homicide. It is the statements concerning the shooting itself which he sought to suppress. His defense to murder was to admit to the jury from the outset of the trial that he had killed the store employee, but that he had done so while under the influence of drugs and alcohol. The statements recited in the confession as made during the interrogation were cold and calculating, made no reference to his drug use, and tended to show Kordenbrock in the worst possible light.

Thus the question is whether the admission of the statements during the guilt phase, and their readmission during the sentencing phase, were harmless error. We deal with the sentencing phase first. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court formulated the harmless error rule in cases where constitutional violations have occurred. Although the Court declined to adopt a rule which would require reversal in all cases where errors of constitutional magnitude occurred, it adopted a stringent harmless error standard. The Court required the "beneficiary of a consti-

tutional error [the state] to prove *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828 (emphasis added).

The Supreme Court recently affirmed that the *Chapman* harmless error standard applies to errors during the sentencing phase of a capital case: "The question ... is not whether the illegally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State had proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Satterwhite v. Texas*, 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798–99, 100 L.Ed.2d 284 (1988) (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828).

The harmless error inquiry is fact specific and requires an analysis of the particular facts at hand. In this case the portion of Kordenbrock's confession taken after the *Miranda* violation—other than the inferences to be made from the fact of the robbery and shooting—was the only concrete, noncircumstantial piece of evidence the state had to prove the premeditation element of the crime. It tended to undermine at the sentencing hearing the claimed mitigating circumstances of diminished capacity due to the use of drugs and alcohol. The Court must entertain with an open mind the possibility that at least one member of the jury took the language of the confession seriously and relied on the harshness of its description to tip the balance in favor of the death penalty. It would be unreasonable to assume that not one member of the jury, in sentencing Kordenbrock, gave weight to the confession when considering the death sentence. Both as an element of the offense and as a reason for imposing the death penalty, the state attempted to prove that Kordenbrock consciously formed an intent to kill independently and uninfluenced by any effect drugs and alcohol may have had on his mental and emotional state. Logically a juror could easily reason that the inadmissible statement that Kordenbrock fired "at their heads so that they wouldn't get up"

implies a mental process of deliberation and forethought sufficient to exclude drugs and alcohol as an immediate or direct cause of the homicide. The defense of diminished capacity turns in part on the factfinder's reasoning about what impelled the defendant to kill: his intent, or the influence of drugs or alcohol on his behavior. Determination about intent and causation in such a case are complex depending on inferences to be drawn from the facts. The inadmissible statements in the confession tend to establish premeditation and are hence inconsistent with the impulsive, reactive and reckless behavior associated with events caused by the influence of drugs and alcohol.

As Judge Kennedy's dissent points out, the circumstantial evidence surrounding the shootings supports a finding of intent to kill. If coupled with the circumstantial evidence that Kordenbrock shot both men execution-style from behind, Kordenbrock's statements that he "pulled the trigger, aiming and firing at [the two men's] heads so that they wouldn't get up" could lead a juror to determine that Kordenbrock consciously formed an intent to kill unaffected by drugs or alcohol. If the jury did not hear these statements, however, the other evidence is not nearly so suggestive. Prior to the coerced confession, Kordenbrock told the police that his eyes were half-closed when he shot the two men and that he did not aim at any particular spot. These statements tend to support Kordenbrock's diminished capacity defense, and a jury hearing this information instead of the coerced confession would certainly view the circumstantial evidence differently. One cannot say beyond a reasonable doubt that the coerced confession did not influence how at least one juror viewed the circumstantial evidence as to whether Kordenbrock had the requisite intent to commit a capital crime.

We are unable to say beyond a reasonable doubt that the portion of the confession in question did not contribute to the sentence. Indeed, after some deliberation the jury asked if they could sentence Kordenbrock to life without parole indicating an interest in imposing the harshest possible sentence short of death. The court said no. The jury was struggling with its decision, apparently uncertain which sentence to impose. If one member of the jury believed that the illegal portion of the confession (which included the words that Kordenbrock "pulled the trigger, aiming and firing at their heads so that they wouldn't get up") tended to dispel arguments in mitigation, the constitutional error was harmful. It is impossible to say beyond a reasonable doubt that no juror held such a view.

### III. Use of Confession To Establish Criminal Liability

■ We now turn to whether the admission of the illegally obtained confession was harmless error in the criminal liability or the guilt phase of the trial. First, the state argues on the question of criminal liability that Kordenbrock may not now raise any objection to the admission of the confession because he waived that right by personally confessing to the killing in his opening statement to the jury. (Kentucky judges sometimes allow, as in this case, the defendant to make an opening statement.) We find the waiver argument to be unpersuasive. The trial court overruled defense counsel's objections to the admission of his confession before trial. Thus, before the trial even began Kordenbrock knew his confession was going to be admitted as evidence. The state's attorney told the jury in his opening statement that Kordenbrock had confessed. Kordenbrock's strategic decision to confess the homicide but not the element of premeditation to the jury in his opening statement was a response to the trial court's pre-trial ruling. Kordenbrock asserted diminished capacity in his opening statement, a defense inconsistent with the state's use of the confession to prove intent to murder. Given these facts we decline to reach the conclusion that Kordenbrock waived his right to object to the admission of the illegal portion of the confession.

Likewise, we reject the state's argument that the Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285,

84 L.Ed.2d 222 (1985), is applicable here. *Elstad* involved a young man who was questioned without being given *Miranda* warnings by police in his living room and confessed to a crime. After he was taken to the stationhouse and given proper warnings he again confessed. Elstad argued at trial that his second confession should not be admitted because it was the fruit of the first tainted confession. The Supreme Court refused to adopt defendant's "cat out of the bag" theory and held that the *Miranda* warnings given defendant before the second confession removed the taint of the confession obtained in violation of *Miranda*. *Id.*, 470 U.S. at 318, 105 S.Ct. at 1297.

*Elstad* is inapposite here. The state argues that the initial *Miranda* violation was cleansed by Kordenbrock's second voluntary confession in open court. In *Elstad* the defendant furnished the police with virtually the same information about his crime in both confessions. Here Kordenbrock did not give the same highly incriminating confession at trial that he did during the police interrogation. He did not admit the same facts regarding premeditation. Kordenbrock is not claiming as did the defendant in *Elstad* that the second confession was the fruit of the first tainted confession and should have been suppressed. On the contrary, Kordenbrock sought to persuade the jury in his opening statement of his version of how the crime occurred which tended to negate premeditation.

■ Having determined that Kordenbrock did not waive his right to object to the admissibility of his confession which was taken in violation of *Miranda,* the Court must again decide whether that admission was harmless error. The *Chapman* standard "requir[es] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

Under Kentucky law, the state must prove intent in order for the jury to return a verdict of guilty. Ky.Rev.Stat.Ann. § 507.020(1) (Baldwin 1984).[3] Although Kordenbrock concedes based on overwhelming physical and testimonial evidence that he was at the scene of the crime and pulled the trigger, the most harmful piece of evidence the state had on the issue of his premeditated intent to kill was the unlawfully obtained confession. The store owner testified that Kordenbrock shot him and his employee after he heard some glass break. However, it does not necessarily follow that Kordenbrock held a clear intent, unaffected by drugs or alcohol, to kill the two men. At trial Kordenbrock claimed that he was under the influence of drugs and alcohol at the time of the shooting and that the shooting was a reflex action. Likewise, the fact that Kordenbrock and his co-defendant "cased" the store for two days prior to the robbery does not prove that Kordenbrock intended to kill the two men—it proves that he was planning to rob the store. *See Owen v. Alabama,* 849 F.2d 536, 540–41 (11th Cir.1988) (where confession was only piece of direct evidence to prove defendant's intent to kill, admission of confession obtained in violation of *Miranda* not harmless error, even where evidence of defendant's guilt for victim's death was overwhelming).

Relying on *Burks v. Perini,* 810 F.2d 199 (6th Cir.1986) (unpublished opinion), the District Court found that Kordenbrock would have adopted the same trial strategy whether or not the confession had been admitted, thereby making the constitutional error harmless. *Kordenbrock,* 680 F.Supp. at 880. This reliance is misplaced. In *Burks,* admission of defendant's confession taken in violation of *Miranda* was found to be harmless error because of the existence of strong independent evidence pointing to defendant's guilt. Defendant testified that he had acted in self defense and that the admission of his confession had undermined his position. However, there was an eyewitness who testified that

---

**3.** Section 507.020 provides:

(1) A person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person....

defendant was not acting in self defense. In this case there was independent evidence that Kordenbrock committed the crime, but there was no explicit evidence other than the confession that plainly tended to contradict Kordenbrock's contention that he was under the influence of drugs and alcohol and did not intend to cause death. For this reason *Burks* is inapplicable.

Here the state pushed hard to get the illegal portion of the confession into evidence on the assumption that the confession would likely influence the jury. We agree with that assumption.

Thus, employing the *Chapman* harmless error rule, we find that the state did not prove, beyond a reasonable doubt, that the admission of the confession which was taken in violation of *Miranda* "did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. The evidence of intent, inferable from the physical facts of the homicide, is strong but not so overwhelming as to make the jury's verdict on intent a foregone conclusion beyond a reasonable doubt. In death cases such as this, if the *Miranda* and *Chapman* rules are to retain any vitality and not be overruled *sub silentio*, we must not allow police officers and prosecutors to use at trial evidence taken in clear violation of the Fifth and Sixth Amendments, evidence which could have affected the outcome of the case.

## IV. *Coerced Confession*

Relying on the same facts that support his *Miranda* claim discussed in Parts II and III above, Kordenbrock claims alternatively that his confession was "involuntary" and therefore inadmissible under the due process clause as well as the Fifth Amendment. By threatening him that his failure to cooperate could result in the detention and interrogation of his girlfriend and others, Kordenbrock contends that police overbore his will in extracting a confession that was "not 'the product of a rational intellect and a free will.'" Petitioner's Brief at 63. Due process analysis in a confessions case requires a reviewing court to consider both the procedural fairness of and the compulsion level created by a particular police practice. *See Gallegos v. Colorado*, 370 U.S. 49, 50–52, 82 S.Ct. 1209, 1210–1212, 8 L.Ed.2d 325 (1962); *see also McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988) ("[P]etitioner must prove that his will was overborne *because* of the coercive police activity in question."), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989).

In this case, however, it is unnecessary to submit to constitutional analysis the identical facts that a majority of this Court has held in Parts II and III to be violative of the Fifth Amendment privilege against self-incrimination under *Miranda*. The Supreme Court precedents interpreting the scope of that privilege set forth the legal consequences of Kordenbrock's custodial interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (questioning must cease once suspect invokes right to counsel unless suspect initiates communication); *Michigan v. Mosley*, 423 U.S. 96, 104–06, 96 S.Ct. 321, 326–28, 46 L.Ed.2d 313 (1975) (invocation of "right to cut off questioning" protects suspect from "repeated efforts to wear down his resistance"); *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966) (once warnings have been given, "[i]f the individual indicates in any manner ... that he wishes to remain silent, the interrogation must cease.") Having found already that police violated Kordenbrock's Fifth Amendment privilege as enunciated in the *Miranda* precedents, we need not reconsider whether those same facts can be constructed so as to establish another similar constitutional violation. Harmless error analysis would yield the same result in both instances. *See ante* Parts II and III. Accordingly, the Court finds no grounds for additional relief based on the due process clause.

## V. *Miscellaneous Claims*

Kordenbrock raises a set of five other claims which the Court believes do not warrant relief. He claims that the prosecutor's comments violated *Caldwell v. Missis-*

*sippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); that mitigating testimony was improperly excluded; that he was entitled to a change of venue because of adverse publicity; that the trial judge should have recused himself; and that his due process rights were violated by the erasure of his taped confession and the loss of a photo display and a vial of pills. We consider each of these arguments in turn.

### A. *Caldwell* Violation

█ In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), state law placed the responsibility for imposing the death penalty with the jury. The prosecutor in *Caldwell* told the jury that their decision was not final and that their decision was automatically reviewable by the state supreme court. The Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who had been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639–40.

During voir dire in this case the prosecutor told jurors that their "recommendation of death, if you gave one as a juror, with your fellow jurors, would not be binding upon the court, but that the [c]ourt would give it great weight." Petitioner's Brief at 73. The prosecutor characterized the jury's sentence as "a recommendation, that is all." *Id.* at 74. Further, the instructions that the trial judge gave to the jury used the word "recommend" in reference to the sentence. Joint App. at 152.

The prosecutor's conduct in this case does not violate *Caldwell* because Kentucky law itself provides that:

> the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist *and to recommend a sentence* for the defendant. Upon the findings of the jury, *the judge shall fix a sentence* within the limits prescribed by law.

Ky.Rev.Stat.Ann. § 532.025(1)(b) (Baldwin Supp.1989) (emphasis added). Thus, the prosecutor technically stated Kentucky law correctly. Similar state sentencing schemes dividing responsibility between judge and jury have been upheld. *See, e.g., Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (judge makes findings on aggravation and mitigation and imposes sentence); *Hildwin v. Florida*, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (jury makes a recommendation without findings on aggravation and then judge imposes sentence).

In order to make out a *Caldwell* violation, Kordenbrock must show that the prosecutor improperly described the jury's role under state law in order to water down their responsibility. *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). The Eleventh Circuit has held that to make out a constitutional violation under *Caldwell* there must be "some affirmative misstatement or misconduct that misleads the jury as to its role in the sentencing process.... [E]mphasizing the 'advisory' role of the jury, or the fact that the jury is making a 'recommendation' to the judge, does not support a *Caldwell* claim." *Harich v. Dugger*, 844 F.2d 1464, 1473–74 (11th Cir.1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). We find no misstatement of state law sufficient to trigger a *Caldwell* violation in the instant case.

Kordenbrock also turns to state law for relief. After the sentence and appeals in this case, the Kentucky Supreme Court in *Tamme v. Commonwealth*, 759 S.W.2d 51 (Ky.1988), held that in the future juries should be instructed to "fix" not "recommend" death sentences. But the court declined to apply the new rule retroactively which means that the prosecutor and the judge did not misadvise the jury concerning the division of sentencing authority.

Thus, although Kordenbrock raises an arguable point worthy of serious consideration, we do not believe that the prosecutor's statements rise to the level of a *Caldwell* violation.

### B. Trial Court's Denial of Mitigation Witness

█ The trial court denied defense counsel's request to call Dr. Stassen, an Associ-

ate Professor of Christian Ethics at the Southern Baptist Theological Seminary in Louisville, during the sentencing phase. Dr. Stassen met with petitioner for about 45 minutes and would have testified that petitioner was remorseful, that he no longer used drugs, and that he could possibly be rehabilitated. The District Court found the exclusion of this testimony both irrelevant and harmless beyond a reasonable doubt. *Kordenbrock*, 680 F.Supp. at 888–90.

Both *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), require that juries be allowed to consider all relevant mitigating evidence with the limitation that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12. Although an expert in ethics, biblical studies and Christian theology, Dr. Stassen was not an expert on the subjects for which he was called to testify, and the exclusion of Dr. Stassen's testimony did not constitute constitutional error on the part of the trial judge. The propriety of the District Court's decision is bolstered by the fact that Reverend Feamster, Kordenbrock's minister, was allowed to testify about his character.

### C. Change of Venue

■ Kordenbrock claims that as a result of adverse publicity he was entitled to a change of venue. A jury psychologist conducted a poll on the opinions of people in surrounding counties who were eligible for jury service. In four out of five counties over 80% of the people polled had heard about the case and in three out of five counties almost 50% of the people polled thought Kordenbrock was guilty of murder. Petitioner's Brief at 111–112; *see also* Joint App. at 171–182 (charts on effect of publicity).

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court delineated the standard for determining juror impartiality where there is widespread, extensive media coverage.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961), *quoted in Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036.

The District Court held that despite the poll "not a single juror or alternate *seated* in the case at hand had formed any opinion on the guilt or innocence of petitioner." *Kordenbrock*, 680 F.Supp. at 887. We find no error in the District Court's findings that the jurors could render a verdict based on the evidence presented in court and that their capacity for impartiality was not compromised.

### D. Recusal of Trial Judge

■ After the trial judge refused to grant Kordenbrock's motion for a change of venue, Kordenbrock filed against the judge an application for a writ of prohibition to prevent the judge from hearing the case. The prosecutor in this case handled the proceeding representing the interests of the state and the trial judge. Joint App. at 63–66. Defense counsel then made a motion for the judge to recuse himself which was denied. *Id.* at 67.

In *United States v. Harrelson*, 754 F.2d 1153 (5th Cir.), *cert. denied*, 474 U.S. 908, 1034, 106 S.Ct. 277, 599, 88 L.Ed.2d 241, 578 (1985), the Fifth Circuit held that recusal was not necessary where there was no evidence of specific conduct by the trial judge which prejudiced defendant. *Harrelson*, 754 F.2d at 1165. There is no basis in this record to base a finding that the judge was biased against Kordenbrock. Certainly the fact that the prosecutor handled the prohibition proceeding is not a basis for such a finding.

### E.   Destruction of Evidence

Lastly Kordenbrock claims that his due process rights were violated when the police erased his taped confession, lost a bottle of pills which were present while he was being interrogated, and lost the photo display which they showed to Mr. Thompson, the store owner, for purposes of identification.

In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* 109 S.Ct. at 337.   Apparently Detective Stamper's secretary, who transcribed the confession, erased the tapes after consulting with the detective.   Joint App. at 1065–66.   From the facts it does not appear that police acted in bad faith in this respect.

Detective Stamper admitted that there was a bottle of drugs on the table in front of Kordenbrock during the interrogation, but did not order that the pills be tested, nor did he preserve the bottle. Joint App. at 1069–71.   In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court held that in order to show that an error of constitutional magnitude occurred in destroying evidence, the evidence must have had exculpatory value and there must have been no other way to get comparable evidence.   *Id.* at 488–89, 104 S.Ct. at 2533–34. In this case Kordenbrock was not prevented from presenting his defense of diminished capacity because the police failed to preserve and test the pills.

Kordenbrock argues further that the store owner's identification of him was influenced by the overly suggestive nature of the photo display which the police failed to preserve.   The Supreme Court set out five factors to consider in determining whether an identification was proper in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972): (1) the opportunity for the witness to view the accused; (2) the witness' attention; (3) the accuracy of the witness' prior description; (4) the witness' certainty; (5) the amount of time between the crime and the identification.

All five of the *Neil* factors are met in this case.   Mr. Thompson, the store owner, had seen Kordenbrock enter his store twice before the robbery took place.   His description of Kordenbrock was accurate, he was certain at the time of the identification, and the amount of time between the crime and the identification was relatively short—less than a month after the crime. Moreover, Kordenbrock has never denied that Thompson's identification is correct, and any error in the photo display, if one had occurred, would be harmless beyond a reasonable doubt.   There was no issue at trial about identification.

The fact that the photo display was lost does not help Kordenbrock's case.   The misplacement or destruction of the display does not entitle Kordenbrock to a presumption that a constitutional violation has occurred.   Under the *Trombetta* test, the display would have not had any exculpatory value.

### VI.   *Refusal to Provide Psychiatric Expert for Defense*

### A.   Applicability of *Ake v. Oklahoma*

The Court holds that *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), should not be read to include a defendant who contests the mental element of the crime and the appropriateness of the death penalty due to diminished capacity. I respectfully dissent.   In *Ake* the Supreme Court held that an indigent defendant is entitled under the due process clause to expert psychiatric assistance where a defendant's sanity is a significant issue.   The Supreme Court further held that a defendant did not have "a constitutional right to choose a psychiatrist of his personal liking. . . ."   *Id.* at 83, 105 S.Ct. at 1096.   The Supreme Court expressed concern that the indigent defendant have access to a "competent psychiatrist who will conduct an appropriate examination *and assist in evaluation, preparation, and presentation of the defense.*"   *Id.* (emphasis added).

The Supreme Court did not address the precise issue of whether an indigent defendant would be entitled to a psychiatric expert when diminished mental capacity rather than insanity is the issue at trial, or when diminished mental capacity is the issue at the capital sentencing hearing. In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court declined to reach an issue raised by petitioner that the state failed to appoint experts and investigators to aid him in his defense. The Court did not reject Caldwell's argument that an expert may be constitutionally required on issues other than sanity. It stated that petitioner had not presented a strong enough case. *Caldwell*, 472 U.S. at 323 n. 1, 105 S.Ct. at 2637 n. 1. Caldwell's motion requesting a ballistics expert did not adequately explain why such an expert was necessary. *Id.*

Two reasons argue that *Ake* covers cases where mental capacity is seriously in issue both on the question of the existence of the intent element of the crime and the question of mitigation of a sentence of death because of diminished capacity: *first*, the law from other circuits and *second*, the reasoning of the Court in *Ake*.[4]

Other circuits have read *Ake* to apply to nonpsychiatric experts. *See Little v. Armontrout*, 835 F.2d 1240 (8th Cir.1987) (en banc), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *Moore v. Kemp*, 809 F.2d 702, 711–12 (11th Cir.) (en banc), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987) (Eleventh Circuit "assume[d], for sake of argument, that the due process clause could require the government, both state and federal, to provide nonpsychiatric expert assistance to an indigent defendant upon a sufficient showing of need.").

In *Little*, the Eighth Circuit held that the indigent defendant in that case was entitled to the assistance of a nonpsychiatric expert where mental state was not a factor and the death penalty was not possible. The dispute in *Little* arose from the victim's identification of the defendant, which occurred only after the victim was hypnotized. The defendant in *Little* was denied funds to hire his own hypnotist expert and was convicted largely due to the victim's identification. Judge Arnold, writing for the Eighth Circuit *en banc*, read *Ake* to include nonpsychiatric testimony:

> The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.

*Little*, 835 F.2d at 1243. In *Little* the court required such expert assistance even where the death penalty is not possible.

> Nor do we draw a decisive line for due-process purposes between capital and noncapital cases. To be sure, the defendant's interest in staying alive is greater and different in kind from his interest in avoiding a prison term, but the latter interest, in our opinion, still outweighs the state's interest in avoiding the relatively small expenditure that would be required.

*Id.* at 1243–44.

Other courts have also addressed the question of what *Ake* requires and when its strictures would be applicable, but no circuit has disagreed with the Eighth Circuit's principle that the question should turn on "how important the scientific issue is in the case." *Id.* at 1243. *See United States v. Crews*, 781 F.2d 826, 833 (10th Cir.1986) (indigent defendant raising an insanity defense entitled to aid of psychiatrist); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir.1985) ("when an indigent accused makes a clear showing ... that his mental condition will be a significant factor at trial," judge must furnish expert).

The Supreme Court's position in *Ake* arises from its earlier admonition that "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to

---

4. The state raises no claim of the nonretroactivity of the *Ake* rule, as applied to the instant case, under the doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The state has waived any argument based on *Teague*.

other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971); *see also Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (state must insure that defendant has meaningful chance to present his defense); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (state must furnish indigent defendant with trial transcript).

The Supreme Court in *Ake* furthered the definition of "basic tools" to include a psychiatrist for an indigent defendant where sanity is a significant factor at trial. The *Ake* court found that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77, 105 S.Ct. at 1093. The Court employed the *Mathews v. Eldridge*, 424 U.S. 319, 325, 96 S.Ct. 893, 898, 47 L.Ed.2d 18 (1976), three-prong test to determine whether "the State [must] provide an indigent defendant with access to competent psychiatric assistance in preparing the defense." *Ake*, 470 U.S. at 77, 105 S.Ct. at 1093. The three factors the Court considered were: (1) "the private interest in the accuracy of a criminal proceeding" which the Court found to be "uniquely compelling," *id.* at 78, 105 S.Ct. at 1093; (2) the state's interest that would be affected by providing expert assistance which the Court found to be "not substantial," *id.* at 79, 105 S.Ct. at 1094; and (3) "the probable value of the psychiatric assistance sought, and the risk of error in the proceeding if such assistance is not offered." *Id.*

It is a somewhat different, though closely related, question whether the "basic tools" of the defense should include the need for the state to furnish an expert where mental capacity rather than sanity *per se* is an issue. The Supreme Court left that question open in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). I conclude that, as a matter of due process, the state must provide a psychiatric expert where the defendant demonstrates that an expert is necessary to aid in a proper defense, and that

without that expert the result of the trial would be unfair. *See Little v. Armontrout*, 835 F.2d at 1244.

Applying the *Ake* three-prong analysis to this case, the first and last parts of which go to the importance of the scientific issue in the case, I believe that Kordenbrock was entitled to a psychiatric expert. His interest in the accuracy of the criminal proceeding—having the jury be in a position to understand the mental and psychiatric aspects of the case—outweighs the cost to the state in furnishing experts. After all, it is the state which is seeking to put the defendant to death. Compared to that cost, the cost of a psychiatric expert pales. The defendant's interest is the more "compelling" of the two. In this case the psychiatric assistance on the subject of diminished capacity would have been valuable to the jury so that it could better understand Kordenbrock's character and family circumstances in weighing aggravating and mitigating factors and better understand exactly what effect the drugs and alcohol had on him. For the same reasons given in *Ake* for requiring a psychiatric expert, the risk of ignorance and error respecting the defendant's mental processes in the trial without psychiatric assistance in this case was high. The jury needed the assistance of an expert to help it understand fully the nature of Kordenbrock's case.

My view of "how important the scientific issue is in the case"—to use Judge Arnold's phrase in *Little*—is reinforced by the trial judge's own effort to provide a defense expert. The trial judge believed it was important. He ordered it twice. His efforts were thwarted by the refusal of the state and local governments to pay, not because the trial judge thought the expert assistance would have been unimportant.

**B. Whether Counsel Deliberately Failed to Secure Payment for the Expert**

Having concluded that Kordenbrock was denied his constitutional right to have an expert aid in his defense because of his indigence, I turn to the state's alternative arguments that defense counsel did not pursue payment for the expert deliberately

to create an appealable issue, that the state psychiatrist satisfied Kordenbrock's right to expert assistance, and that the testimony of a pharmacologist satisfied Kordenbrock's right to expert assistance.

The District Court found that defense counsel failed to ensure that Dr. Nizny received payment because the doctor's report was unfavorable. *Kordenbrock*, 680 F.Supp. at 872. A close examination of the facts and the doctor's report reveals that this finding was erroneous.

After the Fiscal Court refused to pay the doctor, defense counsel alerted the trial judge of its refusal. The trial court again ordered the Fiscal Court to pay the bill. This order was again ignored. The parties were at an impasse at this point. The trial judge, after defense counsel's third request for an order, refused to enter the order until Dr. Nizny filed his report. Dr. Nizny refused to file his report until payment was guaranteed.

The District Court found that defense counsel could have done more to ensure Dr. Nizny's testimony, such as ask the trial judge to hold the Fiscal Court in contempt or to subpoena Dr. Nizny. *Id.* However, Dr. Nizny resided in Ohio, beyond the subpoena power of a Kentucky Court.[5] Defense counsel did not initiate a contempt proceeding in an attempt to secure payment for Dr. Nizny, but the dispute about payment was not caused or brought about defense counsel. It was caused by the conduct of the Fiscal Court and the state. Petitioner should not be punished because the state could not decide who should be responsible for providing funds for an expert.

As support for its contention that defense counsel was deliberately attempting to create an appealable issue, the District Court cites the unfavorable nature of Dr. Nizny's report. *Kordenbrock*, 680 F.Supp. at 872. A reading of the doctor's report shows that it was not entirely unfavorable.

Defense counsel wanted Dr. Nizny to testify as to Kordenbrock's state of mind at the time of the shooting as well as other possible mitigating factors. Dr. Nizny found that Kordenbrock "was almost continually under the influence of alcohol and/or a variety of drugs and medications from age 14 to his incarceration in January, 1980.... This 10 to 11 year span was, to my knowledge, never interrupted by more than a number of hours or days." Joint App. at 269. The doctor's report took into account Kordenbrock's drugs and alcohol intake the morning of the shooting in determining his state of mind. Dr. Nizny found that when the two men entered the store to rob it, Kordenbrock "was aware of his actions though he ignored risks and demonstrated bad judgment...." *Id.* at 270. As for the shooting itself, the doctor's report states that "[t]wo almost simultaneous events, in my view, precipitated his shooting the two men. He heard the glass gun case crash and one man apparently started to rise from the floor." *Id.* The doctor refers to petitioner's actions as "reflex-like" and "impulsive." *Id.* According to Dr. Nizny, Kordenbrock's drug use "decreas[ed] [his] self control" and gave him a "sense of indestructability [sic]." *Id.* at 270–71.

As to other possible mitigating factors, the doctor's report indicates that Kordenbrock was not "a man totally self centered or totally devoid of feeling for another person." *Id.* at 271. The doctor would also have been able to testify about the effect Kordenbrock's family life had on him. *Id.* at 270.

There were some very significant unfavorable aspects of the doctor's report which came out during the evidentiary hearing that the District Court held on the matter. Kordenbrock told Dr. Nizny that he had killed another man in the course of robbing a gas station the night before the shooting in the auto parts store.[6] *Id.* at 1266. At the evidentiary hearing held by the District Court, the prosecutor contend-

---

5. Ky.R.Crim.P. 7.02(5) provides in pertinent part:

> A subpoena requiring attendance of a witness at a hearing or trial may be served at any place within the Commonwealth.

6. Petitioner had been charged with the murder of a gas station attendant but had not yet been indicted.

ed that the doctor's knowledge of the prior crime was relevant to prove Kordenbrock's modus operandi of eliminating witnesses. *Id.* at 1273. This is a debatable point. Defense counsel argued that any possible relevance of this information would be outweighed by its overwhelming prejudice. *Id.* at 1277. Without citation of authority, the District Court found that "any judge would have let [the prosecutor question Dr. Nizny on this issue]." *Id.* at 1275. The judge stated that "by putting the Doctor on you'd have made the whole history relevant." *Id.* at 1277. The fact is that the trial judge never had an opportunity to rule on this question in limine or otherwise because of the state's conduct. We only know that the state judge believed that a defense psychiatric expert was important.

The prosecution's purpose in this line of questioning in the District Court was to show that defense counsel never intended to put Dr. Nizny on the stand because of his knowledge about the crime which took place the night before. But this is pure speculation based on no facts. Even if the trial judge had allowed the doctor's testimony on that issue, in the doctor's opinion the crimes occurred under "identical kinds of circumstances." *Id.* at 1278. His knowledge of the prior incident did not change his opinion of Kordenbrock's actions on the day of the shooting. *Id.* at 1288.

In fact, Dr. Nizny's report and his testimony would have been significant on the issue of intoxication as a mitigating circumstance. The jury could then have decided whether to accept his testimony. The doctor's report stated that Kordenbrock's "intoxication interfered with the capacity to form a specific intent to commit the crimes." *Id.* at 273. Dr. Nizny also testified before the District Court that "I don't see him forming an intent to end someone's life," *id.* at 1225, obviously a fact of importance. The jury might have found this evidence important on the question of death, a subject on which the jury had doubts.

### C. Whether State Psychiatrist Satisfied *Ake*

The state also claims that if Kordenbrock was entitled to a psychiatrist, the state psychiatrist satisfied that right. I find this argument unpersuasive. *Ake* requires that a psychiatrist who serves as a defense expert "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. A "neutral" expert would not be able to serve this purpose. From the facts it appears that the state psychiatrists at the Grauman Forensic Psychiatry Services would not be able to serve as defense experts.

Defense counsel wrote to the Secretary of the Department of Human Resources and asked if psychiatrists at the Grauman Unit could perform this service, and the response was a clear "no." Dr. Stumbo, the Secretary, responded that Grauman psychiatrists were only permitted to perform "objective evaluation[s]" and that their services were "supplied as a service to the court, and not to either the prosecution or defense." Joint App. at 162. In addition Dr. Bland, the state psychiatrist who examined petitioner, "indicated [to defense counsel] that he could not examine Paul as [a] defense psychiatrist because of the Secretary's directive." *Id.* at 166. Paul Farin, general counsel for the Department of Human Resources, also testified that a Grauman psychiatrist "[was] to be neutral in the evaluation process," and that he would not be permitted to testify as to all possible mitigating factors. *Id.* at 1169. With this factual background it is not surprising that defense counsel ordered Kordenbrock not to cooperate with Dr. Bland, a state psychiatrist who was under no duty to treat the psychiatric examination in confidence.

At the evidentiary hearing held by the District Court, Dr. Bland testified that he would have been able, despite the Secretary's directive, to testify as to mitigating factors. *Id.* at 1114. These factors would include family background and environmental factors. *Id.* at 1118. However, during the time that Dr. Bland would have served

as an expert for Kordenbrock, he was only available for defense planning of a case "in a limited way." *Id.* at 1122. Dr. Bland testified that a Grauman psychiatrist would have investigated all issues, "[b]ut ... might not and potentially would not include the depth of areas that might be pursued by a defense-only psychiatrist in terms of looking for everything possible in favor [of] the defendant." *Id.* at 1123–24.

There was also a question of whether records kept by a Grauman psychiatrist would remain confidential. *Id.* at 1125. Indeed, defense counsel testified that he was aware of "two specific instances ... involving public defenders ... where confidentiality ... [was] breached." *Id.* at 1183.

Thus, it was not unreasonable for defense counsel to conclude that he needed a defense expert, not Dr. Bland. In order to perform the services required under *Ake*, defense counsel believed he needed Dr. Nizny's testimony and assistance.

### D. Whether Pharmacologist Satisfied *Ake*

Finally the state claims that Kordenbrock's rights under *Ake* were satisfied by the pharmacologist's testimony. I find this argument to be equally unpersuasive. Because defense counsel was not able to locate another psychiatrist before trial, counsel called Dr. Nelson, a pharmacologist, to testify. Dr. Nelson testified as to Kordenbrock's drug addiction and to his mental state on the day of the shootings: "He ... had a diminished ability to exercise judgment, ethical decisions, and formulate complex thoughts." *Kordenbrock*, 889 F.2d at 77. The original panel in this case found that the pharmacologist's testimony satisfied Kordenbrock's need for an expert because he testified explicitly on the issue of his defense. *Id.*

The purpose of a psychiatric expert was not only to testify as to Kordenbrock's intent to commit the crime. The jury was also entitled to consider all mitigating circumstances to which Dr. Nizny would have

testified. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Dr. Nelson was not qualified to testify about other possible mitigating factors.

This is especially true in light of the witnesses called by the prosecution. To rebut the pharmacologist's testimony, the state called a medical doctor who testified that as a medical doctor he was more qualified to discern Kordenbrock's state of mind than a pharmacologist. The doctor disputed the pharmacologist's opinion about the effect of drugs on Kordenbrock, claiming that Kordenbrock had developed a tolerance to drugs and alcohol. Dr. Nizny testified at the District Court evidentiary hearing, and could have testified at trial, that "there was some evidence that [Kordenbrock] was developing tolerance to the [Q]uaaludes." Joint App. at 1237. However, he also testified that Kordenbrock probably had not developed a tolerance to alcohol, *id.*, and that when petitioner entered the store he was under the influence of both alcohol and Quaaludes. *Id.* at 1221–22.

### VII. *Failure to Instruct Jury on Mitigating Factors*

Kordenbrock also argues that the trial court erred in failing to instruct the jury properly on mitigating circumstances. He claims that jurors need to be told exactly how the penalty phase of a capital trial works. He argues that if juries are not specifically told about the procedure for determining mitigating circumstances they tend to operate as a unit. There is a great danger that a mitigating factor will not be considered when only one juror believes it exists because of the general assumption drawn from other instructions that the jury must act unanimously.

After the penalty phase the trial judge instructed the jury that an aggravating factor had to be found unanimously but refused to give defense counsel's proffered instruction that the jury need not be unanimous with regard to mitigating factors.[7]

---

7. The trial court instruction on aggravating circumstances reads in part:

In recommending a sentence for the defendant Paul Kordenbrock for the murder of

In *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held that a state sentencing form which could reasonably be interpreted to require the jury to agree unanimously that a particular mitigating circumstance existed was unconstitutional because it precluded the sentencer from considering relevant mitigating circumstances. The Court in *Mills* found that some jurors could have reasonably believed that in order to find a mitigating circumstance they had to agree on it unanimously. *Id.* at 384, 108 S.Ct. at 1870. In *Mills* it was clear from the sentencing form that in order to find the existence of an aggravating circumstance the jury had to be unanimous. However, it was not clear from the sentencing form whether a finding of a mitigating circumstance required unanimity. The Court found that "[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Mills,* 486 U.S. at 376, 108 S.Ct. at 1866. The Court used the following standard in determining whether the verdict should stand: "Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." *Id.* at 377, 108 S.Ct. at 1867.

Two circuits have considered the question of what type of instruction on mitigating circumstances is required by the Constitution. In *Davis v. Maynard,* 869 F.2d 1401 (10th Cir.1989), *cert. granted and judgment vacated on other grounds,* —— U.S. ——, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990), the Tenth Circuit held that an instruction defining the role of mitigating circumstances was not necessary. *Davis,* 869 F.2d at 1411. The court found that while the Constitution does require that the jury understand the function of mitigating factors in the sentencing scheme, a specific

instruction was not mandated. *Id.* In *Davis* "[t]he jurors were instructed that mitigating factors should be accounted for in reaching their decision, and that such factors should be balanced against any aggravating circumstances found to exist beyond a reasonable doubt. in deciding between life and death. That is all the Constitution requires." *Id.*

The Seventh Circuit took a contrary view in *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). After considering Kubat's claim that his counsel's performance was deficient because he failed to object to the trial court's instructions, the court addressed Kubat's claim that the jury instructions standing alone required reversal as violative of the Eighth Amendment. The Seventh Circuit construed *Mills* to place certain limitations on how a trial court must instruct a jury during the sentencing phase of a capital case. The court relied on the Supreme Court's language that " 'common sense ... suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation, ... unless they are expressly instructed to do so.' " *Kubat,* 867 F.2d at 373 (quoting *Mills,* 486 U.S. at 383, 108 S.Ct. at 1870). Because juries are likely to act as a unit in sentencing, the court found that the danger of a tainted sentence was high where jurors are "never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, [petitioner] would not be sentenced to death." *Id.*

In this case, as in *Mills,* "[n]o instruction was given indicating what the jury should do if some but not all of the jurors were willing to recognize something about petitioner, his background, or the circumstances of the crime, as a mitigating

---

Stanley Allen, you shall consider the following aggravating circumstance, if you believe from the evidence beyond a reasonable doubt that it exists....
Joint App. at 154.
The instruction on mitigating circumstances reads in part:

In recommending a sentence for the defendant Paul Kordenbrock you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true....
Joint App. at 155.

factor." *Mills*, 486 U.S. at 379, 108 S.Ct. at 1868. I believe there is a "substantial possibility" that the jury construed the instructions to mean that mitigating as well as aggravating circumstances could be found only if the jury was unanimous. The trial judge refused to instruct the jury on this very important point in spite of defense counsel's objections and proffered instruction. It is likely from the jury's question about whether they could sentence Kordenbrock to life without parole that they were struggling with mitigating factors. One or more jurors may have believed there were mitigating circumstances. Because the jurors in this case were told that aggravating factors had to be unanimous, but were not told exactly what role mitigating factors play, it would have been reasonable for them to assume that mitigating factors had to be found unanimously as well.

Death is the ultimate punishment. We must be certain that juries carry out their roles properly in death penalty cases. I believe the jury was confused on the unanimity question concerning mitigation and that the verdict of death may not have been imposed had they understood that one juror could block the death sentence if he or she believed there were sufficient mitigating circumstances.

### VIII.

Accordingly the judgment of the District Court is reversed and the case remanded to the District Court with instructions to issue the writ of habeas corpus giving the state an appropriate period of time to conduct a retrial as to both criminal liability and sentence.

KENNEDY, Circuit Judge, dissenting, with whom Circuit Judges KRUPANSKY, RALPH B. GUY, Jr., and BOGGS concur in all parts, Circuit Judge MILBURN concurs in parts III & IV, Circuit Judges DAVID A. NELSON and RYAN concur in part IV, Circuit Judge WELLFORD concurs in parts I, II & IV, and Circuit Judge ALAN E. NORRIS concurs in parts I, III & IV.

I concur in Part V of the majority opinion. I also accept that appellant's written confession was obtained in violation of his *Miranda* rights. The District Court so found and that finding was not appealed. However, because I believe that the admission of appellant's confession was harmless error beyond any reasonable doubt with respect to both the liability and sentencing phases of trial, I must respectfully dissent. I also would hold, as I did in my opinion for the panel, that there was no *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), violation and that the jury instructions did not violate appellant's constitutional rights.

### I.

Use Of the Confession to Establish Criminal Liability

First, I believe beyond any reasonable doubt that the admission of appellant's confession was harmless with regard to the liability phase of trial.[1] The majority says it was prejudicial error because the confession was the only concrete, uncircumstantial evidence of appellant's intent to commit the shootings. However, as the Court readily admits, there was also strong cir-

---

1. Although the state did not honor appellant's right to end the interrogation, I do not believe appellant's confession was involuntary or coerced. Both the state courts and the District Court found that appellant's will was not overborne and that his confession was the product of free will and rational choice. *See United States v. Murphy*, 763 F.2d 202 (6th Cir.1985). Voluntariness of a confession is a mixed question of law and fact and a reviewing court "will not disturb the trial court's findings ... unless clear error appears on the record." *Id.* at 206. Voluntariness is determined by the totality of the circumstances surrounding the confession,

taking into consideration the accused's age, intelligence, physical condition and emotional state, and the inherent coerciveness of the interrogation setting. *Id.* at 205.

Review of the record shows that although the interrogators at times threatened that several of appellant's friends would be arrested if he did not continue to give a fuller statement, the record as a whole indicates that the trial court's finding of voluntariness was not "clear error." Appellant was cogent, there was no force or threat of force by police, and he was not emotionally distressed. *Cf. United States v. Brown*, 557 F.2d 541 (6th Cir.1977).

cumstantial evidence from which appellant's intent could be inferred. Properly framed, the question is whether the outcome of the trial or conduct of the defense would have been different had the confession been suppressed.

It is beyond a reasonable doubt that the verdict of guilty of capital murder against appellant would have been the same regardless of the admission of the confession. The evidence establishing appellant's guilt in the murder and shooting was overwhelming. The surviving victim of the shooting positively identified appellant and testified how the murder and attempted murder occurred. Appellant, in the course of robbing the store, ordered the two store employees to the back room, forced them to lie prone, and then shot them execution-style. Even if the confession had not been admitted, the only defense available to appellant would be to admit the killing and shooting, but to deny intent because of drug and alcohol use.

The identity of appellant was conclusively established. William Thompson, the surviving victim, had ample opportunity to observe appellant. Two days before the robbery appellant and Michael Kruse were at the Western Auto store from 1:00 to 1:30 p.m. examining woodcutting tools. Thompson was alone at the store and Stanley Allen was at lunch. The next day, appellant and Kruse again went to the store at 1:00 p.m., and appellant purchased a hatchet. Appellant also saw several guns in a glass display case and asked to look at a Colt Python pistol. Thompson showed him the gun and appellant and Kruse left the store without incident.

Further, less than an hour after the robbery, appellant and Kruse went to a Gary Ramell's home where they sold him three of the stolen guns for $200. They then went to the home of Richard Fehler where at 10:30 a.m. they sold two guns, payment for which was due January 15, 1980. According to Fehler, appellant appeared jit-

tery and took some Quaaludes. That afternoon, appellant met a Larry Hensley who purchased six guns for $300, payable the next day. In the meantime, Ramell saw a newscast about the robbery and murder which included composite drawings resembling appellant and Kruse. Hensley also saw the news and noticed that the guns he bought from appellant came in a Western Auto box containing broken glass. Ramell, Fehler, and Hensley decided to cooperate with the police. Hensley arranged to meet appellant at 10:00 p.m., the day following the robbery, to pay for the guns he received from appellant. Appellant was arrested at 10:10 p.m. that night.

Any claim of accidental shooting was impossible in view of the manner in which *both* store employees were shot. The only possible explanations for shooting the men, one in the back of the head and the other in the back of the neck, were that they were attempting to get up or that appellant was attempting to execute them so they could not identify the robbers. In the absence of diminished capacity, intent to kill was the only possible inference a reasonable juror could infer from the circumstances of the crime. The confession that he shot them so "they wouldn't get up" could not affect the outcome.

Had the illegal portion of appellant's confession been suppressed, appellant would have been required to adopt the same trial strategy out of necessity because he was not in a position to claim he did not commit the murders.[2] Before Kordenbrock asked to stop the interrogation, he had admitted committing the murder. This admission was made after he waived his *Miranda* rights. The basic admission of guilt was thus not obtained in violation of *Miranda* He would have admitted the shooting and he would have claimed diminished capacity through drug and alcohol use. Given the strength of the circumstantial evidence establishing intent, his statement that he shot

---

**2.** Regardless of whether *Burks v. Perini,* 810 F.2d 199 (6th Cir.1986) is distinguishable from the present appeal, I see no alternative but that appellant would have been forced to admit that he did the killing. Just as Burks admitted the

crime but claimed self-defense, appellant would have admitted the shooting but claimed diminished capacity. He would have done so because of the strength of the evidence pointing to his guilt.

the men so "they wouldn't get up" gave relatively little additional basis for establishing intent. The most persuasive, damning indication of his intent lay not in the statement that he shot them so "they wouldn't get up," but rather in the facts and circumstances surrounding the crime. The statement in the confession is equivocal on the question of whether it proves intent—it could be an explanation for why he shot the men, or it could be an additional fact gratuitously added at the time of his confession. With or without admission of the confession, appellant would have to at least admit the fact that he shot the two men. The fact that he said in his written confession that he shot them so they wouldn't get up is no more indicative of intent to kill than would be the phrase "I shot them so we could escape" or "I shot them so they would not identify us." Once the circumstances of the shooting were established, there was no explanation except diminished capacity under which the jury would not infer intent to kill.

This case is readily distinguishable from *Owen v. Alabama*, 849 F.2d 536 (11th Cir. 1988), cited by the majority for the proposition that where an illegal confession is the only direct evidence of intent to kill, its admission is not harmless even where evidence establishing the defendant's guilt is overwhelming. In *Owen*, the defendant confessed to a shooting and said that " '[i]f I had a thousand [shells in the gun] I would have shot a thousand. Maybe this will teach them a lesson.' " *Id.* at 537 (quoting *Owen v. State*, 418 So.2d 214, 219 (Ala. Crim.App.1982)). The court determined its admission to be prejudicial error because it provided "significant support" for the state's case and because it undermined his insanity defense. Of course, Owen's confession clearly evidenced intent to kill. Ap-

pellant, on the other hand, merely stated that he shot the men and then explained why. Owen's statement was "dripping" with intent to kill, while appellant's statement was equivocal at most.

Appellant's oral statement to the jury also related essentially the same facts as his written statement—that he shot the two men after stealing the guns from the store, but without the "damning" language that he did it so they wouldn't get up. Appellant's only course, had the confession not been admitted, would be to make the same statement to the jury, either directly or implicitly in his defense. In either case, he would have to admit the deed. The clearest finding of intent stems from the facts that he would be forced to admit, with or without the confession. For that reason, I am convinced that the language of the confession did not prejudice him in the guilt phase of trial and that its admission was harmless beyond a reasonable doubt.

## II.

### Use of Confession at Sentencing

The majority's holding that admission of the confession was constitutional error on the sentencing phase of the trial is founded on the premise that appellant's written confession contained "extremely prejudicial and incriminating statements," Majority Opinion at 1097, which "tended to undermine at the sentencing hearing the claimed mitigating circumstances of diminished capacity due to the use of drugs and alcohol." *Id.* at 1097. According to the majority, the confession was "extremely prejudicial" in the sentencing phase because it omitted reference to drug use [3] and because its tenor was "cold." [4] Neither of these reasons persuades me that admission of his

---

**3.** The majority seems to imply that the officers who conducted the interrogation and recorded appellant's confession intentionally deleted any reference to appellant's drug use prior to the shootings by "edit[ing] out facts" that would support his claim of diminished capacity. Majority Opinion at 1095. Nowhere in the transcript of the interrogation is such an assertion supported. Officer Stamper recorded appellant's confession as appellant related it to him. In fact, at one point the transcript reveals appel-

lant told the officer that he had not used any drugs or alcohol (although that fact was *not* included in the final written confession). It is therefore not surprising that drug and alcohol use was not contained in the written confession.

**4.** The written confession that was introduced at trial said in part "I then, Paul Kordenbrock, pulled the trigger, aiming and firing at their heads so that they wouldn't get up."

confession prejudiced appellant, and I can find nothing in appellant's written confession which would tend to undermine his defense of diminished capacity and cause any member of the jury to reject it as a mitigating factor in sentencing. Indeed, careful review of the record and the evidence presented at trial leads me to conclude that appellant's confession could not have in any way undermined his claim of diminished capacity or prejudiced the jury in sentencing him to death. I will consider each of the majority's reasons in turn.

### 1. Omission of Reference to Drug and Alcohol Use

The Court first argues that appellant's claim of diminished capacity was prejudiced by the admission of his written confession because it did not mention drug or alcohol use. However, whether drug and alcohol use was mentioned in or supported by his written confession is irrelevant. The relevant inquiry is whether the confession logically precluded him from effectively asserting his defense of diminished capacity at trial. Obviously, it did not prevent him from making his defense. The majority seems to ignore the independent, substantive evidence appellant introduced at trial to prove diminished capacity. Consideration of such evidence is essential in determining whether the error in admitting the confession was harmless beyond a reasonable doubt. "In determining whether any particular error can be ... classified [as harmless], this Court must review the facts and the evidence to determine the effect of the unlawfully admitted evidence upon the other evidence adduced at trial and upon conduct of the defense." *Owen*, 849 F.2d at 540 (citing *Fahy v. Connecticut*, 375 U.S. 85, 87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)).

The jury was presented with the testimony of several witnesses who observed appellant either immediately before or after the shootings. Terry Hall testified that appellant arrived at a party at his sister's residence the night before the shootings "in bad condition" with red eyes, slurred speech, and appearing "kind of woozie." Trial Exhibits (TE) 4158, 4164, 4170. Gary Ramell stated that he was "spaced out" and "pretty messed up" at the party. The morning of the murders, approximately seven hours after the party, he awoke and drank two beers and took two Quaaludes, and then took another Quaalude thirty minutes later. Dr. Eljorn Don Nelson, TE 4294–95. Jeffrey Piper testified that he sold appellant ten more Quaaludes about thirty minutes before the shootings. TE 4113. He told the jury that appellant "was very high on Quaaludes," that his speech was slurred, and that his eyes were messed up. TE 4116, 4136. Gary Ramell again testified that about thirty minutes after the shootings he saw appellant and that he appeared "kind of mellow, he didn't seem like he had a care in the world," TE 3791, and that he was glassy-eyed. TE 3806. In his opening statement to the jury, appellant stated that he "shotgunned" two beers the morning of the shootings and took a Quaalude. After stopping to get gas and buy more drugs, he took two more. Appellant also told the jury that when he shot the two men, he was "standing there all messed up from the night before and what I had already consumed that morning." He told the jury that he "never intended to shoot anybody ... [i]t just happened." The jury was thus fully aware of the degree of appellant's drug and alcohol consumption at the time of the shootings.

I fail to understand, as the majority contends, how the mere absence of a reference to drug and alcohol use in his written confession could have in any way undermined appellant's diminished capacity defense. Admission of the confession did not prevent him from putting before the jury all available evidence of his intoxication due to drugs and alcohol. The evidence supporting diminished capacity was neither contrary to, nor even inconsistent with, the statements made in his written confession. Appellant was as able to put on evidence explaining his mental state when he shot the two men as he would have been had the confession been suppressed. It seems to me logically impossible for the confession to have prejudiced his ability to make his diminished capacity defense.

This is not a situation where appellant sought to suppress a confession containing statements contrary to what he would attempt to prove at trial. For example, if appellant had *denied* using drugs or alcohol in his confession, the erroneous admission of it would undermine his defense of diminished capacity and constitute prejudicial error in the manner urged by the majority. Such would also be the case if he had stated in his written confession that he was not intoxicated or high on drugs. However, in the case before us, appellant's confession was innocuous on the matter of diminished capacity because it made no reference to drug or alcohol use at all. Failing to mention it in the confession did not render him unable to prove it at trial, nor would its absence in the written confession make it less likely that the jury would find him to have acted while intoxicated. Appellant seems really to be complaining because a confession which contained reference to drugs and alcohol would be better for his diminished capacity defense. Appellant's confession was independent of and unrelated to his ability to defend based on diminished capacity. As such, I am convinced beyond a reasonable doubt that admission of the confession was harmless error.

## 2. *Tenor of the Confession*

Even if the confession did not prevent appellant from asserting his claim of diminished capacity, the majority contends that the "cold" statement "I then, Paul Kordenbrock, pulled the trigger, aiming and firing at their heads so that they wouldn't get up," may have caused at least one juror to disbelieve that he acted with diminished capacity. I do not agree that any juror could have been influenced by the "cold" tenor of the confession in such a way. The Court again makes no reference to the uncontested testimony that appellant introduced which established his intoxication. As I view the question, the issue is whether appellant's written statement that he shot them so "they wouldn't get up" was so callous, calculating, cold, inflammatory, and prejudicial that *it* could cause any reasonable juror to *reject* all of the evidence

establishing his defense of diminished capacity. Again, determining whether the error was harmless requires us to consider the effect of the illegal confession not by itself, but rather in conjunction with all of the evidence adduced at trial. *See Fahy*, 375 U.S. at 87, 84 S.Ct. at 230; *Owen*, 849 F.2d at 538.

The majority's reasoning would have us assume that a juror, in the face of all the evidence and testimony indicating appellant's intoxication and diminished capacity from his recent consumption of drugs and alcohol, would reject that uncontested testimony simply because of his written statement that he shot them so "they wouldn't get up." His written statement may have been cold, as would be virtually any statement confessing a murder. While it may have been cold, however, I cannot believe that its tone was so callous and calculating that it would cause any reasonable juror to actively and affirmatively ignore the substantive evidence presented at trial which indicated he was intoxicated. I find it incredible to think that any reasonable juror could listen to all the testimony establishing his diminished capacity, and then disbelieve, reject, or ignore that evidence *because* of the language of the confession.

Appellant tempered any harshness of his written confession by his direct appeal to the jury in his opening statement and all the substantive evidence at trial showing his drug and alcohol use. Thus his written word was supplemented with an explanation of his mental state when he shot the two men. That the jury did not believe his defense cannot be logically attributed to his confession, a confession that made no reference to drug and alcohol use. Nothing he added at trial to soften the confession's tenor was even slightly inconsistent with or contrary to his written statement. Although I agree that the written confession may have appeared "cold" to the jury, I cannot agree with the majority that it was prejudicial. No juror, given all the evidence of intoxication, could have rejected the evidence out of hand because of the confession's tenor.

The majority argues, I think correctly, that "[i]f one member of the jury believed that the illegal portion of the confession ... tended to dispel arguments in mitigation, the constitutional error was harmful." Majority Opinion at 1098–99. I strongly disagree with its conclusion, however, that "[i]t is *impossible* to say beyond a reasonable doubt that no juror held such a view," or that "[i]t would be *unreasonable* to assume" that none did.[5] *Id.* (emphasis added). It is not sufficient for the Court merely to assert its conclusion and entertain the notion that a juror might have been swayed by the confession in rejecting appellant's diminished capacity defense. It is at least obliged to set forth some reason why a juror would take such a view in the face of the uncontested evidence appellant introduced.[6] *See Fahy,* 375 U.S. at 87, 84 S.Ct. at 230; *Owen,* 849 F.2d at 540. After considering that evidence, I believe it is not only possible and reasonable to believe that no juror held such a view, but that it is reasonable beyond doubt that none did.

Far from being "the damning statements that undermined his defense of diminished capacity," Majority Opinion at 1095, appellant's confession, because it did not mention drug or alcohol use, logically could not have impeded his ability to prove diminished capacity as a mitigating factor when nothing in the confession was inconsistent with that defense. Moreover, I cannot agree that any reasonable juror would disbelieve or reject all the evidence of his intoxication simply because of the tenor of the confession. I am convinced beyond any reasonable doubt that the erroneous admission of appellant's confession was harmless in the sentencing phase.

### III.

### Failure To Have Psychiatric Testimony

Appellant claims that since he is indigent, the Constitution entitles him to a state-funded psychiatrist to assist him in the guilt and sentencing phase of his trial. Although appellant did not assert insanity as a defense,[7] he hoped to use psychiatric testimony to establish a defense of diminished responsibility based on his habitual drug and alcohol abuse. He also hoped to use the same testimony for purposes of mitigation in the sentencing phase. For the reasons set out below, I agree with the District Court that appellant was not deprived of any constitutional right.

Appellant first obtained the services of a Dr. Melvin Nizny, a Cincinnati, Ohio psychiatrist. Dr. Nizny examined appellant and gave his attorneys an oral report of his evaluation. Although Dr. Nizny ordinarily did not require payment until after he had testified and even though Dr. Nizny had

---

**5.** In support of this contention, the Court points out that the jury, during sentencing deliberations, asked the trial judge whether it could impose life imprisonment with no parole, indicating that the jury was struggling with its decision. I believe the majority is reading too much into the jury's request. Mere indecisiveness or inquiry into sentencing options is hardly evidence that a juror may have been influenced by the confession.

**6.** In making this statement, I am aware that the government, as beneficiary of the *Miranda* violation, must prove beyond a reasonable doubt that the violation did not contribute to the verdict. However, that does not obviate the need for the Court to articulate how, in light of the evidence presented at trial, a reasonable juror could have rejected or ignored it. Simply asserting that one *may* have rejected it is not sufficient.

**7.** "Counsel for defendant Kordenbrock have never served notice of an intention to rely upon insanity as a defense. The Court believes that Kordenbrock has been afforded ample opportunity to develop such a defense if one exists." Order Denying Continuance, June 2, 1981, Judge Sam Neace, Boone County Circuit Court. Appellant's counsel testified at the District Court evidentiary hearing on the writ that appellant's sanity was never considered as a defense:

Q: I understand that your belief was at all times that your client was not insane, nor was he incompetent to stand trial. Is that correct?
A: That's my—that was my belief, and that is my belief.

. . . . .

Q: ... [N]ever at any time did you ever pursuant to the statutory requirements of Kentucky file a notice of your intention to claim an insanity defense, did you?
A: I—that's correct. I had no factual basis to do that.
Deposition of Edward Monahan.

not submitted a bill, counsel for appellant advised Dr. Nizny that Boone County would refuse to pay his bill. Counsel knew that there was an ongoing dispute over whether the county or the state was responsible for paying experts appointed to assist criminal defendants. Counsel advised the Circuit Court that Dr. Nizny would not give a written report or testify unless he was guaranteed payment. The Circuit Court issued an order directing the Boone County Fiscal Court to pay Dr. Nizny. The Fiscal Court refused to do so. Appellant's counsel made no effort to enforce the order. The District Court found that counsel could have urged the Circuit Court to hold county officials in contempt or to levy on county bank accounts or to subpoena Dr. Nizny to testify. It further found that Dr. Nizny would have voluntarily honored a subpoena from the Kentucky court even though served in Ohio.

Dr. Nizny was never advised of the Boone County Court's order directing he be paid one half upon the filing of his report and the other half after he testified. The District Court found that counsel's failure to secure payment and to have Dr. Nizny testify was a deliberate attempt to create an appealable issue. The court concluded that Dr. Nizny's evaluation would not have been useful to appellant's defense, and that his counsel was aware of it. Dr. Nizny's oral report to counsel did not indicate any mental illness. Further, appellant had revealed to Dr. Nizny that on the night before the robbery of the Western Auto store he had robbed a gas station and killed the attendant, the only witness. The unfavorable nature of Dr. Nizny's report,[8] plus counsel's failure to take any of the obvious

steps to obtain Dr. Nizny's assistance, caused the lower court to conclude that appellant was not "denied" psychiatric assistance; he was merely maneuvering to create an appealable issue. *Kordenbrock v. Scroggy,* 680 F.Supp. 867 (E.D.Ky.1988). This is a factual finding made after an extensive evidentiary hearing which can be set aside only if clearly erroneous. *See Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 616 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). Upon examination of the record, I am not persuaded that a mistake had been made. ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") *Id.* The Court holds clearly erroneous the district judge's finding that appellant's counsel did not want Dr. Nizny to testify because, it says, his finding was based on the erroneous assumption that the state court, if Nizny had testified, would have required disclosure of the fact that appellant had robbed, shot and killed the gas station attendant the night before. Although the murder the night before was one of the unfavorable aspects of the report which caused the district judge to conclude defense counsel did not want him as a witness, it was not the only one. Moreover, in larger degree, I agree with the district judge's statement made during arguments before him and quoted in the majority opinion that "any judge would have let the prosecution question Dr. Nizny on this [shooting] issue." Although the information was prejudicial, it was also highly probative. Certainly the fact could not be

---

8. The District Court also found that Dr. Nizny's preliminary report was also unfavorable in that he found appellant had an "anti-social personality," that is, he had no regard to the rights of his fellow man or woman. Also, Dr. Nizny concluded and reported that "it could not be said that rehabilitation was probable." *Kordenbrock v. Scroggy,* 680 F.Supp. 867, 872 (E.D.Ky.1988). The majority state that Dr. Nizny's report "indicates that Kordenbrock was not 'a man totally self centered or totally devoid of feeling for another person.'" Majority Opinion at 1106. What the report says is:

I found him trying, in an adolescent way, to please and to assume responsibility. For ex-

ample, the weekend before the event in question, he cleaned his uncle's barn of manure in exchange for room and board; I do not believe that one would consider *this action* that of a man totally self centered or totally devoid of feeling for another person. Then again, he described being preoccupied with dog footprints on his car and had promised his girlfriend that he would have it washed. After the crimes, he described attention to this but none to his victims.

(Emphasis added.)

concealed from the prosecution. If Dr. Nizny were to testify that appellant probably shot the store employees because he was startled when the glass broke rather than because he wished to eliminate them as witnesses or just wanted to murder them, would not the fact that he had shot the gas station attendant the night before be the most probative evidence to test fallaciousness in the doctor's opinion? Surely, Dr. Nizny would have had to take into account the prior killing in reaching any opinion on rehabilitation. The likelihood of the evidence being admitted is, in my opinion, almost a certainty. Moreover, the Court's inference that counsel did not want Dr. Nizny as a witness does not depend on the certainty that the evidence would come in, but the likelihood. It was on this likelihood that counsel would make their decision. Although I do not condone the state's refusal to pay Dr. Nizny, I find no constitutional violation.

Counsel's further efforts to secure another psychiatrist failed. The case was again continued (it had previously been continued when Dr. Nizny was unavailable) and the trial court ordered appellant to be examined by a psychiatrist at a state institution who could assist in appellant's defense.

Pursuant to that order, appellant was seen on November 21, 1980, by a Dr. James Bland of Forensic Psychiatry Services, a public hospital operated by the Kentucky Department of Human Resources. Dr. Bland was to examine appellant on the issue of his competency and sanity. Because the state restricted such experts to a neutral and objective evaluation concerning only competence to stand trial and sanity, and because he feared that Dr. Bland's opinion might not remain confidential, appellant's counsel advised him not to cooperate.

On May 15, 1981, appellant requested and was granted the appointment of a Dr. Michael Gureasko to act as a defense psychiatrist. However, on May 18th, Dr. Gu-

reasko called the court and told it he would not assist appellant because of a misunderstanding with counsel. The court denied appellant's motion for a further continuance and the case was tried.

Appellant relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) for his claim that the Constitution guarantees him a court-appointed psychiatric expert to assist in his defense and in the penalty phase of trial. *Ake* held that:

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096. The Court qualified this right:

> This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed....

*Id.* Appellant claims his constitutional rights were violated because the county refused to pay for Dr. Nizny's services and because the state-funded expert offered, Dr. Bland, was limited to determining appellant's competence and sanity, and could not make an evaluation concerning his diminished responsibility or other mitigating factors.

However, appellant's claim that the scope of Dr. Bland's examination and testimony was too limited to be effective is without merit. Dr. Bland testified at the evidentiary hearing in the District Court that he could have addressed all of the psychiatric issues appellant's counsel wanted Dr. Nizny to address.[9] Moreover, appel-

---

9. Dr. Bland was a physician specializing in psychiatry. He testified that he would have been able to examine all areas of appellant that Dr. Nizny was requested to examine:

Q: Are any of the [nineteen] questions posed in the letter from Mr. Monahan [appellant's trial counsel] to Dr. Nizny ... in that September the 8th, 1980, correspondence that you

lant's objection that Dr. Bland was neutral and therefore could not give effective defense assistance is without merit. *Ake* merely requires that a *competent* psychiatrist be provided to assist indigent defendants, not the psychiatrist of their choice. 470 U.S. at 83, 105 S.Ct. at 1096. Appellant's argument that Dr. Bland was not required to examine him at his counsel's direction is belied by Dr. Bland's stated willingness to pursue the examination along a course plotted by defense counsel:

> Q: ... Would you have—would you have if directed by the court engage in any other matter which the—defendant's attorneys might ask you to pursue, if ordered by the court?
>
> A: Yes.
>
> Q: Regardless of the amount of time which it might take?
>
> .     .     .     .     .
>
> A: Yes, I would.

Testimony of Dr. Bland. Dr. Bland also stated that his neutral, objective evaluation would have supplied appellant with any information that appellant could use in his defense:

> would have been prohibited, unable or unwilling to address, had you been able to examine and had Mr. Kordenbrock cooperated with you?
> A: I can't say that I would be able to answer all of them in any substantial way. That would depend on a lot of factors. But I don't see any here that I wouldn't be able to address. And in fact they're the types of questions that are commonly asked in trial proceedings regarding my testimony.
> Q: All right. Those questions are commonly posed questions in cases where mental capacity or mental illness might be an issue?
> A: Yes.
>
> .     .     .     .     .
>
> THE COURT: Turn particularly to number 11, what statutory and otherwise mitigating factors exist in Paul's commission of these offenses? Would you have been able to consider that and testify on that if you had come up with some—if they had come up with something favorable to the defendant?
> THE WITNESS: Yes.
>
> .     .     .     .     .
>
> THE COURT: What about number 15, can Paul be rehabilitated? Could you have given the jury in the sentencing phase an opinion on that?

THE COURT: But you would have made the evaluation and called it either way you saw it. You would have made the evaluation. If you thought he was crazy with drugs and irresponsible from the drugs, or couldn't form the criminal intent from the drugs, or form a mitigating circumstance, or anything in his family background were a mitigating circumstance you would have just reported like you saw it, right?
THE WITNESS: I would have just reported it as I saw it and also gave an interpretive opinion about how that might have or might not have in my opinion affected the situation.

*Id.*

I am unpersuaded by the majority's appeal to Dr. Bland's statement that he would be available as an expert "in a limited way." Although it is true that his investigation "might not and potentially would not include the depth of areas that might be pursued by a defense-only psychiatrist in terms of looking for everything possible in favor [of] the defendant," such an expert is not required by *Ake*. Appellant is requesting, and the majority would grant, only the very best defense expert. How-

> THE WITNESS: That was not an unusual question to be asked, your honor. Yes, I could have.

Testimony of Dr. Bland. Dr. Bland was also prepared to investigate and testify as to appellant's family history and psychological background:

> Q: As part of your mental—your examination of an accused, Doctor, during this period is a thorough history taking important?
> A: Yes.
> Q: Would you include in that history as part of your opinions effects of any drugs or alcohol which the defendant might use either chronically, or on the occasion of the crime or on the occasion of a subsequent confession to the crime?
> A: Yes. That would be part of the history.
>
> .     .     .     .     .
>
> Q: And would you have been prepared to testify, Doctor, if called by the defense if you found there to be any effects of any of those things with respect to any of your opinions as to the capacity of an individual?
> A: Yes.
> Q: Likewise, family background, intelligence and other environmental factors?
> A: Yes, that would be considered.

*Id.*

ever, *Ake* requires at most only a competent psychiatrist to "assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096. Dr. Bland's testimony shows he could have and would have provided the necessary assistance.

I agree with the District Court that Dr. Bland's assistance, had appellant taken advantage of it, would have met *Ake*'s command of guaranteeing appellant "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* I also agree that as a matter of strategy appellant chose not to avail himself of this witness. His concern over confidentiality could have been met by a court order. The trial court evidenced a cooperative attitude to provide appellant with the service of a psychiatrist.

Appellant's constitutional rights under *Ake* were not violated. *Ake*'s guarantee of a state-funded psychiatrist arises only after defendant shows that his sanity will be "a significant factor at trial." *Id. See also Harris v. Vasquez,* 913 F.2d 606 (9th Cir.1990); *Cartwright v. Maynard,* 802 F.2d 1203 (10th Cir.1986); *Volson v. Blackburn,* 794 F.2d 173 (5th Cir.1986); *Bowden v. Kemp,* 767 F.2d 761 (11th Cir.1985). Appellant never attempted to raise insanity as a defense. At most he sought to show that his capacity was diminished through drug and alcohol use, thus depriving him of the specific intent necessary to convict him of intentional murder. Although *Ake* does not establish a bright line test for determining when a defendant has demonstrated that "sanity at the time of the offense will always be a significant factor," it is clear that " '*Ake* requires that the defendant, at a minimum, make allegations supported by a factual showing that the defendant's sanity is in fact at issue in the case.' " *Cartwright,* 802 F.2d at 1211–12 (quoting *Volson,* 794 F.2d at 176). Such a showing is not made by merely positing that appellant was a habitual drug and alcohol abuser. *See Pedrero v. Wainwright,* 590 F.2d 1383, 1391 (5th Cir.) (pre-*Ake* case holding that insanity is not made an issue by showing defendant was a drug addict entitling him

to state-funded defense psychiatrist), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979).

Finally, even if the state court did improperly deny appellant access to Dr. Nizny, I agree with the District Court that his constitutional rights under *Ake* were adequately protected by the testimony of Dr. Eljorn Don Nelson. Dr. Nelson taught pharmacology at the University of Cincinnati College of Medicine and directed the college's drug and poison information center. He teaches medical students, physicians and psychiatrists about the diagnosis and treatment of drug and alcohol abuse. He had received special training in the area of psychopharmacology. It is again important to note that appellant admittedly never made his *sanity* an issue—he only sought to establish diminished capacity and the inability to form specific intent because of drugs and alcohol. At trial, Dr. Nelson testified that he had examined appellant and detailed his long history of drug and alcohol abuse. He then testified specifically about appellant's mental state at the time of the crime:

Q: Doctor, do you have an opinion as to Paul Kordenbrock's ability to fully control his actions at 9:30, Saturday, January 5th, 1980, based on ... information about his level of drugs?

A: I think that Paul Kordenbrock was under the influence of alcohol and/or Diazapam and/or Phencyclidene and I think he, probably, as a result of that had a diminished ability to exercise judgment, ethical decisions, and formulate complex thoughts. I think he was basically, in lay terms, he was drunk and stoned. That is my opinion.

Q: ... [D]o you have an opinion as to whether or not Paul Kordenbrock was psychologically and physically addicted to drugs at 9:30 on Saturday, January 5th, 1980?

A: I think he was physically and psychologically addicted to alcohol. If the street tablets contained Diazapam he was certainly psychologically and physically dependent to that.

Testimony of Dr. Nelson. Dr. Nelson's testimony went to the heart of appellant's defense. On appeal, appellant fails to establish how Dr. Nizny's testimony would differ or add to Dr. Nelson's testimony. Although he claims that Dr. Nizny's testimony would have explained to the jury why appellant behaved the way he did, it appears that Dr. Nelson's examination and testimony were sufficient to establish the defense of diminished responsibility and mental capacity. Simply asserting that Dr. Nizny's testimony would have been beneficial is not enough. "Where a defendant offers 'little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [to deny psychiatric assistance].'" *Bowden,* 767 F.2d at 765 (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985)). Appellant's defense was not that he was insane or mentally diseased—it was only that drugs and alcohol affected his ability to formulate specific intent and should have been used for mitigation in his sentence. Therefore, I agree with the District Court that any error in denying access to Dr. Nizny was harmless to the extent that Dr. Nelson examined appellant and testified to the same issues. Appellant's constitutional rights under *Ake* were not violated.

Lastly, *Ake*'s guarantee of access to psychiatric counsel in the sentencing phase of trial does not apply to these facts. *Ake*'s guarantee applies in two situations—when the defendant's sanity is a significant factor at trial and "in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. *Ake* only guarantees a defendant the right to a psychiatrist at the sentencing phase to oppose the government's psychiatric testimony. The Supreme Court explained that the need for a defense psychiatrist arises only when the government uses an expert because "[w]ithout a psychiatrist's assistance, the defendant cannot offer a well-informed expert's *opposing* view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the *State's proof of an aggravating factor.*" *Id.* at 84, 105 S.Ct. at 1097 (emphasis added). In *Bowden,* the court stated that "[u]nlike the sentencing situation in *Ake,* Bowden's prosecutor had no need to present psychiatric evidence to show an aggravating factor, and he presented none. The dangers and inequities which concerned the Court in *Ake* consequently did not exist." 767 F.2d at 764 n. 5. Nor do those dangers and inequities exist in this appeal. The state presented no psychiatric experts at the sentencing phase, only a doctor who was a general family practitioner who testified about the effects of drugs. As such, appellant was not constitutionally entitled to a state-funded psychiatrist under *Ake.* In addition, the testimony given by Dr. Nelson went to the effects of his drug and alcohol abuse and could be used for purposes of mitigation and to counter the state's witness.

## IV.

### Jury Instruction Re Unanimity

■■■ Nor can I agree with the majority opinion that appellant's constitutional rights were violated when the trial judge instructed the jury in the penalty phase that an *aggravating* factor had to be found unanimously, but was silent with regard to how many had to agree in finding a mitigating factor. Appellant claims this caused the jury to mistakenly believe that finding a mitigating factor also required unanimity. In reviewing this claim, I first note that errors of instruction are not reviewable in a habeas proceeding unless they work to deprive appellant of due process. *Long v. Smith,* 663 F.2d 18 (6th Cir.1981), *cert. denied,* 455 U.S. 1024, 102 S.Ct. 1724, 72 L.Ed.2d 143 (1982). The standard for determining this is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' " not merely whether it is erroneous. *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396,

400, 38 L.Ed.2d 368 (1973)). It is clear that the instructions given here did not "infect[ ] the entire trial" and deny appellant due process.

As the District Court held, there is nothing in the instructions that would lead the jurors to believe that finding a mitigating factor required unanimity. The instructions carefully stated that finding an *aggravating* factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement. Indeed it would indicate the opposite. The instructions were not misleading.

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989) relied upon in the majority opinion, is clearly distinguishable from the instant case. Unlike silence, the jury there was specifically told that they must find mitigating factors unanimously.

> If, after your deliberations, you *unanimously* determine that there is no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, . . . .

> If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, . . . .

*Id.* at 369 (emphasis added and in original). Although another instruction permitted the jury to so state if they were unable to reach a unanimous verdict, that could not correct the erroneous instruction.

I therefore conclude that the instruction did not deprive appellant of due process or invade any constitutional right.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's opinion reversing Paul Kordenbrock's conviction and sentence on the grounds set out in parts II–IV of the opinion. However, on the remaining issues, I have additional comments and/or a slightly different analysis of the issues.

Thus, I write separately on each of the remaining parts of the opinion.

## V. *Miscellaneous Claims*

I agree with the majority's treatment of issues B., C., and D. As to issue E., I believe that the police's action of displaying the pill bottle before Kordenbrock during interrogation was intentionally manipulative. I also believe that the police's oh-so-convenient loss of the pill bottle and erasure of the tape are inexcusable bungles for courts to tolerate in capital cases.

As to Issue A., I disagree that the standard announced in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), was satisfied. In *Caldwell*, the Court held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death lay elsewhere." *Caldwell*, 472 U.S. at 328–29, 105 S.Ct. at 2639–40. In *Caldwell*, the Court dealt with a prosecutor's inaccurate statements to a jury regarding its sentencing responsibilities. This case is unique because while the prosecutor accurately informed the jury that the Kentucky capital sentencing law in effect at the time of Kordenbrock's case requires a jury to "recommend" the sentence in a capital sentencing proceeding, the statute itself did not accurately reflect the *de facto* sentencing responsibility of the jury which was to fix the sentence.

In cases where the term "recommendation" has been upheld for jury instructions informing the jurors of their sentencing function, the states involved actually limit the jury's function to giving a non-binding recommendation to the trial judge. *See, e.g., Harich v. Dugger*, 844 F.2d 1464, 1473–74 (11th Cir.1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989) (Florida); *see also* Project, Nineteenth Annual Review of Crim.Proc.: United States Sup.Ct. and Cts. of App. 1988–89, 78 Geo.L.J. 669, 1294 n. 2747 (1990) (noting that Florida, Alabama, and Indiana use a jury recommendation system as an advisory opinion for trial judge). The Kentucky

sentencing statute in effect at the time Kordenbrock was sentenced mischaracterized the binding nature of the jury's decision as a "recommendation" when in fact the jury fixed the penalty as either life or death. Consequently, the capital sentencing jury instructions were amended by the Kentucky Supreme Court in *Tamme v. Commonwealth*, 759 S.W.2d 51 (Ky.Sup. Ct.1988), to accurately state the jury's role.

Most courts have held that *Caldwell* focuses solely on the prosecutor's statements regarding the applicable sentencing law and that there must be a misstatement regarding that law for a *Caldwell* violation to have taken place. Yet, *Caldwell* speaks in broader terms, holding that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rest elsewhere." *Caldwell*, 472 U.S. at 328–29, 105 S.Ct. at 2639–40. The fact that the words of the Kentucky statute are inaccurate, not the prosecutor's instructions, is immaterial because the harm and constitutional deficiency stem from the jurors' false perception of their sentencing responsibility.

The standard for a challenge to the jury instructions themselves was set out in *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). The Court held that the defendant "necessarily must show that the remarks made to the jury improperly describe the role assigned to the jury by local law." 109 S.Ct. at 1215. Here, the fact that the Kentucky statute was accurately described does not mean that in application, the law was constitutional. The statute clearly gave the jury a false sense of its actual responsibility—thus necessitating the Kentucky Supreme Court's amendment, in *Tamme*, of the statutory instructions. In *Dugger*, the Court declined to reach the issue because the defendant failed to object to the allegedly improper instructions. Interestingly, the Court referred to the issue as a *Caldwell* issue despite the fact that it was a jury instruction issue, not a prosecutor's statement issue—supporting my view that *Cald-*

*well* applies to misleading jury instructions as well. Consequently, I believe that this case presents the highly unusual situation where an accurate description of the capital sentencing statute is unconstitutional because Kentucky's statute inaccurately described the jurors' actual role.

## VI.  *Refusal to Provide Psychiatric Expert for the Defense*

### A.  Applicability of *Ake v. Oklahoma*

I join Chief Judge Merritt's dissent on this issue. The question is whether *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), is limited to providing an indigent defendant with a psychiatric expert for presenting only a sanity-related defense. I believe that such a limitation on *Ake*'s holding is an unusually myopic reading of the reasoning in that opinion.

I fully agree with Chief Judge Merritt's analysis of this issue. The extension of *Ake* beyond the sanity issue is supported both by Justice Marshall's *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), due process analysis in *Ake* and by the lower federal courts and state courts that have recognized that *Ake* stands for the proposition that the state must furnish the defense with the "basic tools" for an adequate defense. *Ake*, 470 U.S. at 77, 105 S.Ct. at 1093; *see, e.g., Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir.1987) (en banc), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988) (holding that *Ake* required even non-psychiatric experts); *Moore v. Kemp*, 809 F.2d 702 (11th Cir.) (en banc), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987); *State v. Coker*, 412 N.W.2d 589, 593 (Iowa 1987) (defendant entitled under *Ake* to expert on intoxication defense); *In re Allen R.*, 127 N.H. 718, 506 A.2d 329 (1986) (*Ake* entitled defendant to mental health expert on issue of defendant's competency to waive *Miranda* rights); *but see State v. Massey*, 316 N.C. 558, 342 S.E.2d 811, 816 (1986) (defendant not entitled to expert on competency to waive *Miranda* rights); *Stafford v. Love*, 726 P.2d 894 (Okla.1986) (*Ake* limited to

psychiatric experts only); *Ex parte Grayson*, 479 So.2d 76 (Ala.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985) (*Ake* limited to psychiatrists and the insanity defense). I believe that under Justice Marshall's due process/fundamental fairness analysis, *Ake* provides for experts on issues other than sanity.

Moreover, I believe that Kordenbrock's right to an expert for his diminished capacity defense is equally cognizable under his equal protection clause argument. In a pre-*Ake* state habeas case, the Fourth Circuit held that the equal protection clause required the state to provide expert assistance for a criminal defense "when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance." *Williams v. Martin*, 618 F.2d 1021 (4th Cir.1980). This right, according to the court, was "firmly based on the equal protection clause." *Id.* at 1026. There, the request was for a pathologist to assist the defendant's argument that a gunshot wound did not cause the victim's death. The court held that the equal protection clause required the appointment of the pathologist. I believe Kordenbrock satisfies the standard in *Williams v. Martin* and that his entitlement to an expert is solidly established under the equal protection clause as well as under the due process reasoning in *Ake*.

I agree with Chief Judge Merritt that Kordenbrock's counsel cannot be found to have manufactured an appealable issue by "deliberately failing to secure payment for an expert."

I also concur with Chief Judge Merritt's reasoning that *Ake* requires more than a "neutral" expert. The language of the majority opinion and dissent in *Ake* shows that the expert was deemed to be a defense expert. While *Ake* does not give the defendant the expert of his choice, it does indicate that the defense is entitled to an expert "who will conduct an appropriate examination and *assist in evaluation, preparation, and presentation of the defense*." *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096

(emphasis supplied). The tasks of the defense psychiatrist were described as "to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses." *Id.* at 82, 105 S.Ct. at 1096. It is clear that the *Ake* majority did not contemplate a neutral psychiatrist as satisfying due process. Indeed, Justice Rehnquist assailed the majority in his dissenting opinion for establishing the right to a "defense consultant." *Id.* at 87, 105 S.Ct. at 1098. Moreover, in *Ake*, the Court all but overruled *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), where the state had supplied neutral psychiatrists.

The reason for a partisan witness is clear. Dr. Bland, the state psychiatrist, testified before Judge Bertelsman at the habeas hearing that he could not pursue theories desired by the defense, assist their cross-examination, nor guarantee confidentiality to the defense. As stated by the Tenth Circuit, the Court's duty to appoint a defense expert under *Ake* "cannot be satisfied with appointment of an expert who ultimately testifies contrary to the defense.... The essential benefit of having an expert in the first place is denied the defendant when the services of the doctor must be shared with the prosecution." *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir.1985); *see also United States v. Crews*, 781 F.2d 826, 833–34 (10th Cir.1986) (despite testimony of four treating or court-appointed psychiatrists, defendant was entitled to his own psychiatrist to aid in the interpretation of the experts' finding and to assist in cross-examination); *but see Magwood v. Smith*, 791 F.2d 1438, 1443 (11th Cir.1986) (court upheld denial of defendant's request for independent expert where three of the state's six experts testified in favor of the defense). In *Magwood*, the court overlooked the fact that presenting testimony is only one of the many functions of the psychiatric expert and the defendant was deprived of the assistance of cross-examining the defense experts. The use of an impartial expert subverts the

adversary process by making a single expert the ultimate decider of the issue. The jury or judge can only make a principled decision when there is a "battle of the experts" where truth is more likely to emerge through each side presenting its own case. With a "neutral" expert, the defense cannot really challenge the findings of adverse testimony because that expert is the only one available to the indigent defendant. Moreover, a potential for conflict of interest emerges when a state agency uncovers incriminating evidence—is its duty to the defendant or to the public? While a defendant is not entitled to an expert who will testify to the issues in a way that the defendant wishes, the expert must be "partisan" in the way a retained expert would provide assistance to the defense. *See generally* Note, Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of *Ake v. Oklahoma*, 84 Mich.L.Rev. 1326, 1349–54 (1986); Comment, Nonpsychiatric Expert Assistance and the Requisite Showing of Need: A Catch–22 in the Post–*Ake* Criminal Justice System, 37 Emory L.J. 995, 1008, 1018–22 (1988).

Recently, the Fifth Circuit held that *Ake* was not violated by court appointment of a psychiatrist whose examination report to both the defense and prosecution. *Granviel v. Lynaugh*, 881 F.2d 185 (5th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990). In a dissent from the Court's denial of certiorari, Justice Marshall, *Ake*'s author, joined by Justice Brennan, blasted the decision as unfaithful to *Ake*'s clear requirement of a partisan expert—not a "disinterested" expert. I believe that Justice Marshall's dissent, although obviously not a majority opinion, is a particularly persuasive comment on *Ake*'s requirements since he is that opinion's author.

I concur in Chief Judge Merritt's analysis of the issues concerning whether a pharmacologist satisfied *Ake*. I also join in Chief Judge Merritt's analysis of the jury instructions regarding the jury's consideration of mitigating factors in Part VII of the opinion.

KRUPANSKY, Circuit Judge, dissenting.

I join in Judge Kennedy's dissenting opinion with the following comments.

As the district court and the dissenting opinion observed, the absence of Dr. Nizny's appearance and the testimony during the state trial and sentencing proceedings was a calculated defense strategy implemented by astute legal counsel who, from the outset, perceived and recognized the callous implications of the appellant's action when, during the course of a planned robbery, he killed Stanley Allen and attempted to kill William Thompson by deliberately shooting each of them, in the back of the head, after ordering them to lie face down on the floor of a storage room at the rear of the Western Auto Store in Florence, Kentucky, where both men worked.

Challenged by the malevolence of the appellant's actions, which were confirmed by the psychiatric examination and oral evaluation of Dr. Nizny, a respected psychiatrist of appellant's choice, counsel implemented a course of trial tactics designed to induce error into the record for purposes of appeal, a result they successfully accomplished. The district court's conclusion that defense counsels' deliberate efforts insured against Dr. Nizny testifying in appellant's defense was firmly supported by the evidence and is not clearly erroneous.

It is conceded by the defense that appellant has never alleged nor had he placed insanity in issue before the Boone Circuit Court of Kentucky (Circuit Court) or subsequent courts. It should also be noted that appellant's request for funds to retain a psychiatrist of his choice was nevertheless granted.

The first of three psychiatrists to examine appellant was Dr. Warner W. Anderson. In evaluating appellant's competency to stand trial and his mental state at the time of the robbery and shooting, Dr. Anderson concluded:

I could find no evidence from the examination that this man suffers from any mental illness.... He could *not account for anything including drugs*

that would have altered his mental state on the day of the alleged murder.... He did not appear to be remorseful about the fact that he had taken someone's life.... The *history that he presented suggested a series of episodes indicating antisocial behavior.* He is aware of the seriousness of the charges against him and is aware that the possible consequences could result in his being executed in the electric chair. I feel he is capable of assisting counsel in his own defense. (emphasis added).

On or about May 14, 1980, at the Circuit Court's suggestion, defense counsel inquired into the availability of qualified psychiatrists at various state facilities, particularly the Grauman Forensic Psychiatry Unit (Forensic Psychiatry Services) who were available to provide "an objective evaluation" for both competency or the existence of a mental disease, defect, or condition at the time of the alleged criminal act. Subsequent to further communication with Grauman, defense counsels' request to participate in appellants defense was declined because "this department cannot allow itself to be used as the tool for either side in criminal matters but must maintain an objective stance."

Subsequent to an in camera hearing conducted on July 18, 1980, the Circuit Court authorized defense counsel to select and employ a psychiatrist, a psychologist, and a psychopharmacologist of their choice whose fees would be paid by the state. On August 15, 1980, defense counsel advised the Circuit Court that after discussing the desired psychiatric evaluations and related expert opinions concerning appellant's diminished capacity immediately before and during the robbery with 16 psychiatrists and 8 psychologists, all "refused to assist the defense."

However, on August 26, 1980 defense counsel notified the Circuit Court that they had selected and retained Dr. Melvyn Nizny as their psychiatric expert of choice. On October 6 and 13, 1980, defense counsel, in support of appellant's motion for a continuance, advised that Dr. Nizny's report would not be available until November 5, 1980, and that defense counsel had

agreed to pay Dr. Nizny one-half of his fee upon submission of his written report, the balance to be forthcoming at the conclusion of his testimony, although it was Dr. Nizny's policy to submit fee schedules only after he had concluded his examinations, evaluations, submitted a written report and testified at trial. Dr. Nizny had not suggested or requested defense counsels' payment arrangement.

Defense counsel also alerted the Circuit Court that the Boone County Fiscal Court (Fiscal Court) would probably refuse to pay Dr. Nizny because of a jurisdictional controversy between it and the State of Kentucky over which political subdivision was responsible for payment of expert fees in criminal cases, which ongoing controversy would require the commencement of a mandamus action necessitating the postponement of appellant's scheduled trial on November 6, 1980. At the conclusion of the hearing the Circuit Court ordered the Fiscal Court to pay Dr. Nizny's fees and continued the trial of November 6, 1980.

With this reflection of historical circumstances surrounding defense counsels' "efforts" to obtain psychiatric assistance on behalf of appellant, the United States District Court for the Western District of Kentucky noted that on November 6, 1980, *after* Dr. Nizny had examined the appellant and orally reported to defense counsel, that his psychiatric examinations of the appellant reflected no mental illness and that, during the course of extended interviews, appellant had disclosed that on the night before the murder of Allen and the attempted murder of Thompson during the robbery of the Western Auto Store he had killed a service station attendant while robbing a Star Service Station in Kentucky. He also told Dr. Nizny that after the murder he visited his girlfriend where he met Michael Kruse and partied with three women until the following morning. Dr. Nizny opined to defense counsel that as a result of his three examinations of the appellant he concluded that the appellant had "an antisocial personality," with no regard for the rights of his fellow human beings and

that "it could not be said the rehabilitation [of Kordenbrock] was probable."

Confronted with this highly prejudicial and damaging evidence, which would have become available to the state through the cross-examination of Dr. Nizny,[1] defense counsel promptly notified Dr. Nizny that the Fiscal Court had refused to pay his fees and that in all probability would not compensate him for his professional services as promised and that defense counsel could not guarantee payment. Contemporaneously, defense counsel told the Circuit Court that Dr. Nizny would not submit a written report and would refuse to appear as a defense witness until he was paid or guaranteed payment of his fees.

It is noteworthy that although the Circuit Court had ordered the Fiscal Court to honor and pay the professional fees of Dr. Nizny, which decree was ignored, defense counsel made no effort to enforce the Circuit Court's order by proceeding in contempt or to otherwise levy upon county bank accounts or to request or subpoena the doctor to testify in person or by deposition.

Also reflecting upon defense counsels' "good faith" efforts to present Dr. Nizny as a witness is the doctor's disclosure that he had never been informed of the Circuit Court's order directing his fees be paid, and his assertions that he would have voluntarily appeared as a witness if requested even though he was beyond the subpoena jurisdiction of the Kentucky Circuit Court and even though he had not been paid.

On November 21, 1980, the Circuit Court ordered appellant to the Forensic Psychiatry Services for evaluation because defense counsel had been "unsuccessful in their efforts to procure the services of a psychiatrist of their own choosing, and the trial of this cause having been unduly delayed because of the lack of such expert assistance." Defense Counsel immediately directed appellant "not to communicate with the psychiatrist as long as Forensic is not acting as our full-fledged defense psychiatrist."

On April 22, 1981, trial was scheduled for June 16, 1981. On May 6, 1981, defense counsel requested the appointment of Dr. Michael Gureasko, another forensic psychiatrist of their choice, which request the Circuit Court granted on May 15, 1981. On May 18, 1981, a defense motion for continuance was filed supported by the affidavit of Dr. Gureasko. On the same day Dr. Gureasko telephoned the Circuit Court to request the withdrawal of his affidavit and of his decision not to participate in the case due to a "disagreement or misunderstanding with defense counsel." The motion for continuance was denied and the case proceeded to trial.

The related sequence of events reflects an objective manifestation of defense counsels' efforts to discourage any objective psychiatric examination, evaluation, or testimony on behalf of the appellant, which had all the appearances of psychiatric shopping. In *Harris v. Vasquez,* 913 F.2d 606, 620–21 (9th Cir.1990), which was a case of equal premeditation and brutality, the appellant's psychiatric profile revealed an "anti-social personality" without remorse or the "ability to profit from past experience or punishment." The Ninth Circuit rejected the argument that appellant was denied access to qualified psychiatric assistance because the defense, for tactical reasons, much like this case, suppressed the testimony of two psychiatrists of appellant's choice. Thus, I concur with the district judge and the dissenting opinion in the conclusion that defense counsel deliberately induced error into the record for purposes of appeal and that Dr. Nizny's failure to appear at appellant's trial did not, under the circumstances of this case, constitute a constitutional infringement.

The subtle sagacity and effectiveness of defense counsels' tactics in implementing appellant's defense strategy is again demonstrated by their decision to have the defendant personally address the jury by

---

**1.** The dissenting opinion has fully discussed the relevancy and admissibility of Dr. Nizny's ad-

verse trial testimony.

reading a prepared and obviously tailored opening statement which emotionally described his physical and mental condition as impaired by heavy and continuous drug and alcohol consumption the night before and immediately preceding the Western Auto Store robbery.

The result of defense counsels' adroit legal maneuver is apparent from the expressed concerns of at least two of my associates who have become troubled by the stark contrast between the appellant's signed confession which was read to the jury "as a simple, direct, calm, and confident recitation of cold-blooded murder.... entirely devoid of any reference to alcohol or drug use, any suggestion of hesitancy to act or confusion of purpose, or any tinge of regret" and the defendant's opening statement at trial wherein he detailed a "narrative of heavy and continuing drug and alcohol consumption immediately preceding the killing, an abbreviated description of the robbery and shooting in language thinking of uncertain purpose, and then an explicit denial of an intent 'to shoot anybody.'"

The reason for the disparity is obvious from a review of the verbatim transcript of appellant's interrogation conducted immediately subsequent to his arrest which Judge Nelson, in a concurring opinion, characterized in the following language:

The appellant's exercise of his right to remain silent produced no untoward consequences at all. There was no exercise of physical force, no threat of physical force, no hint of physical force. The verbatim transcript of the interrogation does not suggest that the police ever lost their tempers, or even so much as raised their voices. If I had been a prosecutor in this case, I daresay I would have been quite content to have a videotape of the questioning shown in open court.

At no point did the police try to get the appellant to shade the truth in any way. After the appellant said that he was the one who pulled the trigger, for example, the questioner said "Don't jack us[;] if you didn't [do it] tell us[;] if you did[,] tell us." There is no reason at all to doubt the sincerity of the appellant's response, which was "Sir, I did it, I told you." This is simply not a case where the police were trying to browbeat a suspect into confessing to a crime that he might not have committed.

The interrogation was not prolonged unreasonably; the verbatim transcript takes less than 40 typewritten pages, with a new line for the start of each question and each answer. There is no indication that the appellant was deprived of food or drink or bathroom privileges. When he wanted a cigarette, he was given a cigarette. When he asked for an exercise break, he was given an exercise break. This is a long way indeed from the rubber hose or the rack and thumbscrew.

The interrogation reflects that for two and a half hours two interrogating officers cajoled, solicited, urged, coaxed, and requested appellant to explain or offer some reason for the murders which appeared to have been perpetrated in a cold, calculated manner. Not during this entire period, apart from expressing a need for money to pay hospital bills, did the appellant once, directly or indirectly state or infer that he was confused, irrational, hallucinating or in any way physically or mentally incapacitated by fatigue, the ingestion of drugs or alcohol or any combination thereof when he shot his victims in the back of the head while they were helplessly lying face down on the floor.

My colleagues, in discussing their troubled concerns avoid, *sub silentio*, appellant's *unequivocal denial of having ingested any drugs, or alcohol or being confused, spaced-out, or irrational from fatigue, drugs, or alcohol during the morning of and at the time he shot his victims.*

The colloquy which could be considered pertinent to the defense of diminished capacity resulting from drug or alcohol is concise and certainly dispositive of the expressed concern arising from the disparity between the appellant's signed confession and his opening statement.

Q:  Were you taking some kind of drugs or something, were you out of it?

A:  No, Sir.

Q: Were you mentally worn out, you really didn't know what you were doing? Had you been up for 3 or 4 days worrying yourself sick over your hospital bills?

A: Just know I needed money to pay bills.

\*　　\*　　\*　　\*　　\*　　\*

Q: It's been done and you can't undo it. We just like for you to cooperate and tell us why it happened (inaudible) there's bound to be some damn reason behind this crazy thing. People just don't do that, you just don't get that way over night, there's bound to be something that made you do it or got you to go that far, you know.
Was you numb Paul?

A: What?

Q: Was you numb?

A: Numb. No, sir, I wasn't.

Moreover, the signed confession which contains the totality of his material disclosures made during his interrogation is the statement that he read, acknowledged, and was willing to sign at the conclusion of the inquiry.

The answer to Judge Nelson's musings that "at an emotional level—and jurors do have emotions—I think it [the exclusion of selected disconnected phrases from appellant's interrogation from his written confession] could have tipped the scales" is also apparent from a review of the verbatim transcript of that quest for information.

Read in context, when appellant stated he was "scared shitless" he was not referring to a confused, irrational state of mind, panic, or other form of diminished capacity he experienced immediately before, during, or after the murders that had been induced by fatigue, drugs, or alcohol. He was expressing a calculated fear of being identified and returned to prison at some future time either as a probation violator or as a participant in the instant robbery.

Q: Are you still on probation down in Covington?

A: Yes, sir.

Q: How long?

A: How much longer?

Q: Yeh.

A: Two more years.

\*　　\*　　\*　　\*　　\*　　\*

Q: Paul, we're going to find all this stuff out, it's just a matter of time, look how much we've already dug up and in a way the body ain't even cold, you know that, just a matter of time, all the people we've got out working right now.
Paul, did those guys put up any kind of a struggle with you?

A: The one guy started to get up when the customer came in.

Q: Did you think he was going to get up and fight you or something?

A: I didn't know.

Q: Did that scare you?

(no answer)

Q: Was you afraid of going back to jail that much that you had to shoot him? Did you fear it that much?

A: Well, I was scared shitless.

The remaining omissions from the confession of concern to Judge Nelson related to the events immediately preceding the shootings while the appellant's view of the retail area from the rear storage room where he was holding his victims at gunpoint was totally obscured. Shortly after directing Thompson into the storeroom where the clerk Allen was cleaning shelves, he ordered both men to lie face down, head to head, in a 9 o'clock position, he then heard a customer enter the store and an audible conversation between his accomplice and some unknown person. Obviously "he didn't know what was happening" in the retail area until after he heard the customers leave the store when it was "too late".

The isolated extrapolations from various pages of the interrogation transcript which the appellant adamantly refused to clarify during persistent importuning by his interrogators appear as meaningless, disjointed, unrelated expressions which fail to reflect upon the appellant's claimed defense of diminished capacity.

*Contrary to the inferences of the panel majority, that appellant was foreclosed from fully presenting his evidence of diminished capacity, the record discloses that he introduced the totality of that evidence which he was desirous of placing before the jury for its consideration.*

Initially, his staged and scripted personal appearance before the jury where he read a carefully prepared, emotionally charged, opening statement insulated from any threat of personal impeachment through cross-examination[2] was dramatic. He described how he and his accomplice had partied the night before the Western Auto Store robbery, his hangover during the morning of the robbery, how he "shot gunned" three cans of beer and swallowed a single qualude tablet before leaving his sister's residence, the site of the party, to rob the Western Auto Store. He related how he and his accomplice stopped enroute and had a ham and cheese sandwich, purchased gasoline and ten qualudes of which each consumed two before they proceeded to "get the guns." He explained to the jury how he was "all messed up from the night before and what he had already consumed that morning" and how "I heard a crashing of glass and I'm not sure what caused my next movements, but I shot both men." He then told the jury that, "I ran to the front of the store and Mike had the guns and we left. I never intended to shoot anyone. It just happened. I ran around the next day and a half trying to sell the guns. I got arrested the next Sunday night and told them I did it and it is something that I have been living with for the past eighteen months and 26 days. I don't know how to put it in words how I feel."

A parade of defense witnesses followed who attested to the appellant's impeachment-free opening statement. The subject of his diminished capacity immediately before, at the instant of, and after the shooting, was thoroughly exhausted for the jury through appellant's opening statement and the direct and cross-examination of the witnesses who appeared on his behalf.

The state counterbalanced appellant's claim of diminished capacity by overwhelming proof, independent of appellant's signed confession, which reflected a well planned, efficiently implemented robbery and escape. Key to the state's evidence against the appellant was the positive identification of the appellant and the eye-witness detailed account of William Thompson, the manager of the Western Auto Store, who miraculously survived the intended instantaneous death from the bullet directed to his head by the appellant. He not only survived but remained conscious during the entire ordeal and had total recall of the entire incident.

Thompson testified that on two consecutive days next preceding the robbery, appellant and his accomplice Kruse visited the Western Auto Store and browsed for approximately 30 minutes on each occasion under suspicious circumstances. On each of the two visits Thompson was the only person attending the store. During these visits appellant and his accomplice noted the store room at the rear of the premises which was protected from the view of customers and sidewalk pedestrians and the location of the locked glass handgun display cabinet.

The state's evidence further developed that after leaving his sister's apartment on Saturday morning, January 6, 1980, appellant and his accomplice Kruse proceeded to a gas station where they bought gasoline and ten qualudes from the station attendant. They then proceeded directly to the Western Auto Store approximately five minutes away. Before leaving their automobile, which was parked across the street from the store, appellant took a revolver from under the seat of the vehicle which he carried into the Western Auto Store. Thompson testified that he observed both men enter the store at approximately 9:30 a.m., when the appellant immediately directed him at gun point into the rear storage room where Allen was cleaning shelves and ordered both men at gun point to lay face down, head to head, in a 9 o'clock position while he stood over them. Thomp-

2. The defendant did not take the witness stand to testify in his own defense.

son further testified he heard a customer enter the store and a conversation during which appellant's accomplice directed the customer to a hardware store to have his chainsaw sharpened. Thompson further testified that *after* he heard the customer depart he heard the sound of breaking glass, which he surmised was the glass of the gun display cabinet.

Thompson testified further that some moments *after* he heard the shattering of glass a shot exploded and he felt a searing and burning sensation in the back of the head, a pause before he heard a second shot which he knew was directed at Allen. The state further proved that the appellant had been awarded a marksman citation during his two years service with the Marines, that the two shots fired into his victims were fired from a distance of approximately eight to ten feet. It was apparent that firing a single shot from that distance, into an area as small as the base of a human skull, required sustained concentration, a steady arm, a steady hand, and a controlled trigger finger. Common knowledge dictates that a premeditated head shot is intended to cause instant death. It was also apparent from the evidence that the same concentration and physical control of placing the first shot had to be deliberately repeated a second time to accurately place the second shot into an area about the size of a billiard ball.

After firing both shots the appellant searched the rear room and found a cardboard box suitable for packing the handguns which he carried into the retail area of the store. The evidence further disclosed that the two men thereupon carefully separated the guns from the shattered glass shards from the display case and placed the weapons into the cardboard container which the appellant casually walked across the street to Kruse's automobile. The appellant and his accomplice thereafter drove to a parking lot some distance away where they divided the handguns.

They then proceeded to the residence of appellant's friend, Gary Ramell (Ramell), arriving there at approximately 10:00 a.m. The appellant negotiated the sale of three guns to Ramell for the sum of $200.00. The pair then continued on to the home of another of appellant's friend, Richard Fehler (Fehler), arriving there at approximately 10:30 a.m. He negotiated the sale and sold additional guns to Fehler and picked up a cassette tape deck. Appellant and Kruse then returned to his sister's apartment, arriving at approximately 12:30 p.m. where they remained for approximately two hours during which time they attempted to install the cassette tape deck. Karen Bowman (Bowman), appellant's sister's roommate, testified that both men appeared normal during this period of time.

Kruse departed at about 2:30 p.m. and appellant borrowed Bowman's car and drove to the home of his cousin, Jim Hoffman, where he was to meet Larry Hensley (Hensley), who was interested in purchasing appellant's remaining handguns. Appellant negotiated the sale of his remaining guns for a price of $300 payable the next day. Appellant and Fehler, who had accompanied him to Hoffman's residence, returned to Fehler's home where they met Ramell at approximately 7:00 p.m. While appellant and Fehler were selling the remaining handguns to Hensley at the Hoffman residence, Ramell had viewed a television news account of the murder and robbery complete with photographs that resembled appellant and Kruse. Appellant hurriedly left the Fehler residence when Ramell attempted to question him about the source of the guns which he had purchased from the appellant. Ramell, Fehler, and Hensley notified the police and agreed to cooperate in an investigation. As a result of their effort, appellant was apprehended at 10:10 p.m. on the night of Sunday, January 7, 1980. The appearance and action of the appellant immediately subsequent to the robbery and during the period when he was negotiating the sales of the handguns was described as normal. Certainly, his composed, calculated, and systematic efforts to negotiate the sale of the stolen handguns displayed no signs of panic, remorse, irrationality or other evidence of diminished capacity.

Albeit, the appellant's signed confession, as suggested by Judge Ryan, may have

been "a simple, direct, calm and confident recitation of cold blooded murder.... devoid of any suggestion of hesitancy to act or confusion of purpose, or any hint of regret" and "an unqualified confession of premeditated murder." It was, nevertheless, the statement that the appellant wanted to sign. It was, in no detail, inconsistent with the overwhelming proof independently developed by the state and unanimously accepted by twelve of his peers who sat in judgment and sentenced him to death.

In sum, dispassionately reviewed, it was the state's overwhelming proof of the premeditated, deliberate, methodical, merciless, and cruel course of conduct which was pursued by the appellant from the selection of the robbery target, the "casing" of the premises, the systematic perpetration of the crime, including the execution and attempted execution of all identifying witnesses, to his post-execution activity in negotiating the sale of his stolen weapons, that reflected the objective manifestation of the appellant's complete physical and mental self-control: a self-control that was demonstrated immediately before and at the moment he deliberately fired the two shots into the skulls of two helpless men, while he executed his robbery with the precision of a planned military manuever, which included the intended execution of all identifying witnesses, and during an organized escape. Appellant's demonstrated deliberate course of conduct belies any irrational, confused reflex actions that conveyed "the impression of clouded thinking and purpose" or a state of panic.

The jury, not the members of this reviewing court, had the opportunity of observing the behavior of the witnesses upon the witness stand; their manner of testifying; the reasonableness and probability of their testimony; the opportunity they had to see, hear, and know the things about which they testified; the accuracy of their memory; their candor or lack of candor; their intelligence, interest, and bias, together with all the circumstances surrounding their testimony, obviously assign greater credibility to the witnesses and testimony presented by the state. It assigned little, if any, credibility to the appellant, his witnesses, and their testimony. The panel majority *in absentia* now invades the jury's exclusive domain to judge the weight and credibility of the trial-developed evidence by rejecting its unanimously assigned credibility evaluations with a conjectured possibility anchored in factually unsupported suppositions and hypotheses, presumptions that do not rise to the level of a legal probability that, "it would be unreasonable to assume that *not one member of the jury, in sentencing petitioner, gave weight to the confession* when considering the death sentence." The speculation that a single juror might have been swayed by the confession in rejecting appellant's diminished capacity defense in the face of the state's overwhelming evidence is not only highly improbable, but impossible. To the contrary, it is reasonable beyond doubt that none did. I am convinced from the record beyond a reasonable doubt that the erroneous admission of appellant's confession was harmless in the sentencing phase of this case.

Accordingly, I join in Circuit Judge KENNEDY's dissenting opinion, which affirms the disposition of the district court.

WELLFORD, Circuit Judge, dissenting.

I concur fully in Judge Kennedy's opinion with the reservation that I am not persuaded that Kordenbrock's trial counsel was trying to create an appealable issue by his somewhat inept handling of Dr. Nizny's potential as a witness for defendant. In any event, this has no bearing on the guilt stage of the proceedings in light of the overwhelming evidence that Kordenbrock intentionally killed one man and, but for fortuitous circumstance, would have killed another. Furthermore, *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) requires only that an indigent defendant who specifically pleads insanity or its equivalent, is to be provided a competent psychiatrist "to assist in evaluation, preparation, and presentation of the defense," not one of defendant's (or his counsel's) choice. Defendant's constitutional rights

under *Ake* were not violated under the circumstances of this case.

This view of *Ake* is fully supported by *Harris v. Vasquez*, 913 F.2d 606 (9th Cir. 1990):

> Harris argues that he was denied access to a qualified psychiatrist who "conducts professionally competent examinations of the defendant and who on this basis provided professionally competent assistance." Appellant's Brief at 15. Harris contends that access to such psychiatric assistance is required by the due process protection holding in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We disagree.
>
> Under the narrow holding of *Ake*, the state must provide an indigent defendant with access to psychiatric assistance in only two circumstances: (1) at the guilt phase of a trial, when the defendant has demonstrated that his sanity at the time of the offense is likely to be a significant factor in determining guilt; and (2) at a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness. [Fn. 11] *Id.* at 83, 105 S.Ct. at 1096.

Another court has recently considered an indigent defendant's constitutional challenge, relying upon *Ake*, to the appointment by the court, in the case of an insanity plea to capital murder charges, of a psychiatrist "whose opinion and testimony is available to both sides." *Granviel v. Lynaugh*, 881 F.2d 185 (5th Cir.1989). Such an expert was available to Kordenbrock in this case. In denying this challenge, the court stated:

> "A psychiatrist's examination is not an adversary proceeding. Its purpose is not to aid in the establishment of facts showing that an accused committed certain acts constituting a crime; rather its sole purpose is to enable an expert to form an opinion as to an accused's mental capacity to form criminal intent." *Stultz v. State*, 500 S.W.2d 853, 855 (Tex.Crim. App.1973), *quoted in Granviel* [*v. State*], 552 S.W.2d [107] at 115 [ (Tex.Cr.App.1976) ]. Granviel's ability to uncover the truth concerning his sani-

ty is not prejudiced by a court-appointed, neutral expert. Availability of a neutral expert provides defendants with "the raw materials integral to the building of an effective defense." *Ake*, 105 S.Ct. at 1093. The state is not required to permit defendants to shop around for a favorable expert.

*Id.* at 191, 192.

I am in agreement with the views of both *Harris v. Vasquez* and *Granviel v. Lynaugh* with respect to the proper interpretation of *Ake*. Judges Merritt and Martin rely upon authority such as *United States v. Sloan*, 776 F.2d 926 (10th Cir.1985). That case involved a situation where the trial judge, faced with a defense of insanity and/or incompetence, appointed the same psychiatrist to examine the defendant who would be available to serve as a witness for the prosecution as well. The essential ruling of *Sloan* was that *Ake* is not satisfied by "appointment of an expert who ultimately testifies contrary to the defense on the issue of competence." *Id.* at 929. The fact situation in *Sloan,* not a capital case, is completely distinguishable from the fact situation in the instant case. *United States v. Crews*, 781 F.2d 826 (10th Cir. 1986), also cited by Judge Martin in his expansive interpretation of *Ake*, involved as *the basic issue* in the case, also a noncapital case, the competence or sanity of the defendant who requested appointment of a psychiatrist. *Crews* is also inapplicable to the facts of this case; it interprets a federal statutory requirement (18 U.S.C. § 3006A(e)(1)) and whether a defendant, specifically pleading incompetence or insanity, is entitled to appointment of a psychiatrist to assist him in this defense. *Ake* is a narrow holding applicable to specific unusual factual circumstances presented in that case.

RALPH B. GUY, Jr., Circuit Judge, concurring.

I concur in Judge Kennedy's opinion and write additionally only on the *Miranda* issue. As Judge Kennedy points out, the government did not appeal the district court ruling that the confession was ob-

tained in violation of *Miranda*. Had that issue been before us, however, I would have concluded contrary to the district court. Since I believe the confession was properly admitted, that obviously influences my judgment on the issue of the prejudicial effect, if any, of the confession in both the guilt and punishment phases of this trial.

DAVID A. NELSON, Circuit Judge, concurring, joined by Circuit Judge RYAN.

Like Chief Judge Merritt, I am not satisfied beyond a reasonable doubt that suppression of the tainted portions of the appellant's confession would have made no difference in the vote of any member of the jury. My doubt extends to the jury's resolution of both the question whether the appellant was guilty of premeditation and the question whether he should be sentenced to death.

The untainted evidence against the appellant was very strong, as the dissents of Judges Kennedy and Krupansky persuasively demonstrate, and if this had not been a capital case, I would have been quite willing to invoke the harmless error rule.[1] Death cases can be different for jurors as well as for judges, however, and it seems to me that a jury that wanted to know whether the appellant could be sentenced to life imprisonment without possibility of parole (an option not available under Kentucky law) might very well have settled for life imprisonment with a possibility of parole had it not been for the emotional impact of the appellant's written statement.

That statement, as read to the jury during the Commonwealth's case-in-chief, strikes me as significantly more damaging, forensically, than an account of the unexceptionable portion of the preceding interrogation would have been. Early in the interrogation, for example, the appellant said, among other things, that "something snapped," that he "didn't know what was happening" when the customer came into the store, that he didn't realize what was happening until "too late," and that he was "scared shitless." None of this was in the written statement, which simply said that the appellant aimed at the victims' heads and fired "so that they wouldn't get up." At a rational level, perhaps, the stark phraseology of this admission ought not to have made any difference. But at an emotional level—and jurors do have emotions—I think it could have tipped the scales. I therefore concur in the conclusions announced in Parts II and III of the majority opinion. I also concur in the disposition of the miscellaneous claims dealt with in Part V.

As to whether the appellant gave his written statement under compulsion, I have no quarrel with the suggestion in Part IV of the majority opinion that we need not decide the question. The appellant having invoked his right to cut off questioning before he gave the written statement, *Miranda* and its progeny, including *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), teach that the interrogation should have been stopped forthwith; that taking even a voluntary statement thereafter was improper; and that habeas corpus proceedings may be used to set aside a conviction and sentence obtained through use of a voluntary statement taken subsequent to a request that questioning be cut off. See *Martin v. Wainwright*, 770 F.2d 918, 922–24 (11th Cir.1985), *modified*, 781 F.2d 185 (11th Cir.), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (right to cut off questioning not "scrupulously honored" when questioning was continued after suspect said "Can't we

---

1. One fact of potentially devastating significance—that the appellant told his psychiatrist that he killed someone else the day before he killed Mr. Allen—was never made known to the jury. If the jury had understood that there were two robbery-related homicides, committed a day apart, it would obviously be harder for us to conclude that the inadmissible portions of the confession could have affected any juror's vote. But it is undisputed that the prejudicial effect of the appellant's account of the single killing for which he was placed on trial must be analyzed in light of what the jury was told in the trial that actually occurred, and not what another jury might be told in a trial yet to come.

wait until tomorrow;" voluntary confession obtained later that day held inadmissible.)

If the appellant's written confession was not "compelled" in a constitutional sense, however, I do not believe it is accurate to suggest, as the majority opinion does at several points, that there was a violation of *constitutional* norms. The Supreme Court has made it clear that *Miranda*'s exclusionary rule "sweeps more broadly than the Fifth Amendment itself." *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985). "The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony," *id.* at 306–07, 105 S.Ct. at 1291–92 (emphasis in original), while *Miranda* prohibits that and more. I have joined in the court's judgment in this case not because I think the Constitution says I must, but because I think the Supreme Court says I must.

To an observer from almost any foreign country—including England and other jurisdictions that follow the same common law tradition we do—the conclusion that the Kentucky trial court was required to exclude the appellant's written confession even if the confession was voluntary might well seem odd. Given the circumstances of the interrogation that led to the confession, there is a large part of the civilized world in which the wisdom of suppressing the confession probably would not be considered self-evident.

To begin with, before any questions at all were put to the appellant the police told him—twice—that he had a right to remain silent. They told him—twice—that he had a right to talk to a lawyer before any questions were asked, and that he had a right to have a lawyer with him during any questioning to which he might consent. They told him—twice—that if he could not afford a lawyer, one would be appointed for him, if he wished, before questioning began. And they told him—twice—that if he decided to answer questions without a lawyer present, he would still have the right to stop answering at any time.

The appellant said at the outset that he understood these rights. He stated both orally and in writing that he did not want a lawyer and was willing to make a statement and answer questions. In the questioning that followed, the appellant repeatedly demonstrated that he really did understand his right to remain silent; many of the questions were met with complete silence, the appellant saying nothing at all and simply waiting for another question to be put.

The appellant's exercise of his right to remain silent produced no untoward consequences at all. There was no exercise of physical force, no threat of physical force, no hint of physical force. The verbatim transcript of the interrogation does not suggest that the police ever lost their tempers, or even so much as raised their voices. If I had been a prosecutor in this case, I daresay I would have been quite content to have a videotape of the questioning shown in open court.

At no point did the police try to get the appellant to shade the truth in any way. After the appellant said that he was the one who pulled the trigger, for example, the questioner said "Don't jack us[;] if you didn't [do it,] tell us[;] if you did[,] tell us." There is no reason at all to doubt the sincerity of the appellant's response, which was "Sir, I did it, I told you." This is simply not a case where the police were trying to browbeat a suspect into confessing to a crime that he might not have committed.

The interrogation was not prolonged unreasonably; the verbatim transcript takes less than 40 typewritten pages, with a new line for the start of each question and each answer. There is no indication that the appellant was deprived of food or drink or bathroom privileges. When he wanted a cigarette, he was given a cigarette. When he asked for an exercise break, he was given an exercise break. This is a long way indeed from the rubber hose or the rack and thumbscrew.

It is true that in what proved to be a successful attempt to persuade the appellant to continue talking after he had indicated that he preferred to stop, the questioners played on the appellant's concern

that the three "girls" with whom he had spent the preceding night not be taken into custody or otherwise "hassled" by the Cincinnati police. This kind of psychological pressure does not necessarily render a confession involuntary, see *Martin v. Wainwright,* 770 F.2d at 926–27, and I suspect that prior to *Miranda,* few American judges would have considered the use of such a ploy impermissible. The appellant having asked that the questioning be ended, *Miranda* makes it clear that the police did go too far; it is not at all clear that they went too far under the Constitution itself.

Be that as it may, we are obviously bound to follow the decisions of the Supreme Court unless the Court (or Congress, where Congress has power to act) instructs us otherwise. There were strong reasons for the Supreme Court's decision to adopt the prophylactic rules that were put into place with *Miranda,* and perhaps even the outer limits of those rules—which is all we are dealing with here—are immutable. If the Supreme Court is concerned about the practical effect of the more far-reaching of the non-constitutional parts of the *Miranda* rules, however, this case might be an appropriate one for further scrutiny.

With respect to Part III of Judge Kennedy's opinion and Part VI of Judge Merritt's opinion, both of which deal with the constitutionality of the Commonwealth's refusal to provide the psychiatric expert the appellant says he wanted, it is my understanding that the funding problem that existed at the time of trial has now been resolved. Because it appears that a psychiatric expert will be provided on retrial, I do not think it is necessary for us to decide the issue—and the present record contains some factual idiosyncrasies which suggest to me that it would be prudent for us to steer clear of it.

As to the proposed jury instruction regarding unanimity on mitigating circumstances, I concur in Part IV of Circuit Judge KENNEDY's opinion.

RYAN, Circuit Judge, concurring.

Because I am unable to say, beyond a reasonable doubt, that the unlawfully admitted confession did not contribute to the verdict and subsequent death sentence in this case, I cannot vote to affirm.

My reasons are those so well stated by Judge Nelson in his concurring opinion. I add, however, this additional thought:

One need only read the illegally admitted written confession, and then the defendant's opening statement, to appreciate the stark contrast between the two. The written statement reads as a simple, direct, calm, and confident recitation of cold-blooded murder. It is entirely devoid of any reference to alcohol or drug use, any suggestion of hesitancy to act or confusion of purpose, or any hint of regret. The defendant's opening statement at trial, on the other hand, is a detailed narrative of heavy and continuing drug and alcohol consumption immediately preceding the killing, an abbreviated description of the robbery and shooting in language conveying the impression of clouded thinking and uncertain purpose, and then an explicit denial of an intent "to shoot anybody."

While the two statements are consistent in that, in both, the defendant acknowledges the robbery and killing, they are dramatically inconsistent in the important details concerning the clarity of the defendant's thinking, his use of alcohol and drugs, and his criminal purpose; in a word, his state of mind, the vitally important single element that determines, in the last analysis, whether the defendant shall be put to death.

The illegally admitted confession is not only an explicit and damning admission of the killing, it is, by its language, tone and content, as well as the absence of any claim of diminished capacity or uncertainty of purpose, powerful circumstantial proof of a clearheaded intention to execute both victims. It is a complete and unqualified confession of premeditated murder, strikingly inconsistent with the defendant's courtroom claim of diminished capacity. As such, it is the most powerful, although not the sole, evidence in the record of the defendant's malice and premeditation. I cannot say, beyond a reasonable doubt, that

such evidence did not "contribute to the verdict." *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

I concur in Circuit Judge NELSON's opinion in all other respects as well.